*This opinion is subject to revision before final publication in the Pacific Reporter*

**2015 UT 10**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

JOSE ANGEL GONZALEZ,
*Appellant,*

*v.*

STATE OF UTAH
*Appellee.*

No. 20120945
Filed January 27, 2015

Third District, Salt Lake
The Honorable Vernice S. Trease
No. 111906002

Attorneys:

Nisa J. Sisneros, Samuel J. Hanseen, Nathalie S. Skibine,
Salt Lake City, for appellant

Sean D. Reyes, Att'y Gen., Kris C. Leonard, Asst. Att'y Gen.,
Salt Lake City, for appellee

JUSTICE PARRISH authored the opinion of the Court, in which
ASSOCIATE CHIEF JUSTICE NEHRING, and JUSTICE DURHAM joined.

JUSTICE LEE authored a concurring opinion; concurring in part
and concurring in the judgment in which CHIEF JUSTICE DURRANT
joined.

JUSTICE PARRISH, opinion of the Court:

## INTRODUCTION

¶1   Jose Angel Gonzalez was convicted of murder with an enhancement for criminal street gang activity, obstruction of justice, and possession or use of a dangerous weapon by a restricted person. On appeal, Mr. Gonzalez argues that the trial court erred by (1) denying his motion for directed verdict on the murder and obstruction-of-justice charges, (2) permitting the State to present allegedly cumulative and unfairly prejudicial gang-related evidence, and (3) dismissing as untimely his constitutional challenge to the gang-enhancement statute. We affirm the trial court on all issues.

## BACKGROUND

¶2 Mr. Gonzalez is a member of the Dog Town street gang, which is affiliated with the Sureño street gang.[1] He has several gang-related tattoos, including the words "Dog Town" tattooed in large print across his forearm. Mr. Gonzalez is known among fellow Dog Town members by the moniker "Flaco." On the afternoon of August 9, 2011, Mr. Gonzalez and his girlfriend Alexis had been at a friend's house in West Valley, Utah. After getting into an argument with Mr. Gonzalez, Alexis left the friend's house and walked toward a nearby Kohl's department store. Mr. Gonzalez followed Alexis, and the two made up shortly before reaching Kohl's. Alexis then went inside Kohl's to use the restroom while Mr. Gonzalez waited outside the store entrance.

¶3 While Mr. Gonzalez was waiting alone outside Kohl's, George Davila, his girlfriend Anjelica, her sister Alma, and Alma's four-year-old son Miguel walked past Mr. Gonzalez. Mr. Davila had been a member of Familia Por Siempre, a Norteño-affiliated gang[2] and a Dog Town rival, but had recently joined an independent street gang, QVO. Mr. Davila had gang-related tattoos, but none were visible to Mr. Gonzalez. Mr. Davila, however, noticed the "Dog Town" tattoo on Mr. Gonzalez's forearm, and the two exchanged aggressive words.[3] Anjelica, who was a former Kohl's employee, then went into Kohl's to complete some paperwork while Mr. Davila, Alma, and Miguel went next door to a shoe store.

¶4 While Mr. Davila was at the shoe store, Mr. Gonzalez remained outside Kohl's and spoke on a cell phone with two friends, Rosa and Robie. Several other phone calls and text messages were exchanged between Rosa, Robie, and other members of the Dog Town gang. One such text message stated, "flacoz getting down."

---

[1] The Sureño gang originates from southern California and is considered the umbrella gang for numerous regional gangs such as Dog Town.

[2] Like the Sureño gang, Norteño is an umbrella gang originating in southern California.

[3] The State presented evidence that Mr. Gonzalez asked Mr. Davila, "What's up my ese?" to which Mr. Davila responded, "I'm not your ese." The State also presented evidence that Mr. Davila, upon seeing Mr. Gonzalez's tattoo, may have said "Fuck Dog Town."

¶5 A short time later, Mr. Davila, Alma, and Miguel returned to Kohl's, entering through a different entrance, and went to the customer service desk to meet Anjelica. Mr. Davila and Miguel then went to the men's restroom near the customer service desk. Approximately one minute later, Mr. Gonzalez entered Kohl's, went back to the customer service desk with Alexis, and approached the men's restroom. Surveillance cameras showed Mr. Gonzalez giving Alexis a one-armed hug while maintaining his other hand in his pocket just before entering the restroom. An eyewitness testified that she heard Alexis urge Mr. Gonzalez to "just let it go."

¶6 Mr. Gonzalez then entered the restroom, propping the door open with his foot. Mr. Gonzalez asked Mr. Davila, "What's up ese?" to which Mr. Davila responded, "I'm not your ese," and within seconds the two men began fighting. Miguel saw Mr. Gonzalez use a knife to "shank[]" Mr. Davila. The fight lasted less than a minute and spilled out into the customer service area before Mr. Gonzalez fled the scene with Alexis, dropping a knife in the store as he left. Mr. Davila, who was bleeding from the side of his abdomen, ran outside with Anjelica, Alma, and Miguel to drive to Pioneer Valley Hospital.

¶7 As Mr. Davila was fleeing Kohl's, Dog Town members gathered in the Kohl's parking lot. The congregated Dog Town members yelled toward Mr. Davila, "Die fucker, die" and "Dog Town!" as he was getting into the car to go to the hospital. Two of the Dog Town members then entered Kohl's, quickly walked around the store, briefly spoke to the store manager about the fight and stabbing, and walked out again.

¶8 Angelica, Alma, and Miguel accompanied Mr. Davila to the hospital. Police arrived soon after. While they were questioning Miguel just outside the hospital, Miguel recognized two men he had seen in the Kohl's parking lot walking toward the hospital entrance and notified one of the officers. The officers stopped the men and found them carrying a bat and a knife. The two men were identified as members of Dog Town and were taken into custody and questioned regarding the incident.

¶9 Police later located Mr. Gonzalez, took him into custody, and interviewed him. Mr. Gonzalez admitted to stabbing Mr. Davila but claimed that he had acted in self-defense and used a knife because Mr. Davila was larger and stronger than he.[4] Mr. Gonzalez

---

[4] Mr. Gonzalez measures six feet tall while Mr. Davila measures

(continued...)

stated that after the fight, he went home, washed in a bowl of water, changed shirts, then drove around West Valley and threw his bloody shirt down a storm drain, knowing the police may be interested in it. Pursuant to a search warrant, officers recovered from Mr. Gonzalez's home the hat Mr. Gonzalez was wearing in the Kohl's surveillance video, a blue bandanna, and a pair of shorts, each bearing Dog Town gang symbols.

¶10 Mr. Davila sustained numerous injuries and a total of seven stab wounds in the fight with Mr. Gonzalez. His injuries included a stab wound to his left lower back that perforated his spleen and punctured his pancreas, a stab wound to his lower left chest, two cuts on his face, a stab wound to his right biceps, and various blunt injuries on his mouth and other bruising. Mr. Davila died at the hospital from his stab wounds. Mr. Gonzalez received a cut to one finger and the back of one wrist and some abrasions on his shoulders.

¶11 The State charged Mr. Gonzalez with murder, a first degree felony in violation of Utah Code section 76-5-203 with a criminal-street-gang enhancement under Utah Code section 76-3-203.1; obstruction of justice, a second degree felony in violation of Utah Code section 76-8-306(1); and possession of a dangerous weapon by a restricted person, a third degree felony in violation of Utah Code section 76-10-503(2)(b).

¶12 Prior to trial, Mr. Gonzalez stipulated to his membership in the Dog Town gang, as well as to Mr. Davila's membership in a street gang. The State nevertheless moved to admit gang-related evidence, including the testimony of gang experts. Mr. Gonzalez opposed the admission of the gang evidence, arguing that it was irrelevant because he had already stipulated to his and Mr. Davila's gang membership. The trial court ruled that the State could admit the gang-related evidence, acknowledging that gang evidence could be relevant to the underlying charges and that it would be appropriate to present it to the jury for that purpose.

¶13 On the first day of trial, Mr. Gonzalez moved to bifurcate the trial so that the jury would only hear the gang-enhancement charge if it convicted Mr. Gonzalez of murder. The trial court met the motion with some hesitancy, stating that "the motion is late and

---

[4](...continued)
six feet two-and-a-half inches tall. Witnesses testified that Mr. Davila was "a little more stocky" and "a little meatier" than Mr. Gonzalez.

should have been made some time ago." Nevertheless, the court granted the motion but made clear that the ruling did not preclude the court from admitting "gang information that may be relevant to the elements of the underlying offense."

¶14 During the trial, the State called several eyewitnesses, including Alma and Miguel. Alma and Miguel testified on the first and second days of trial, before Mr. Gonzalez had been identified as the assailant. Neither Alma nor Miguel knew Mr. Gonzalez's name and instead referred to him as either "Dog Town" or "Dog Town guy" throughout their testimony.

¶15 The State also called two gang experts—Deputy U.S. Marshal Richard Simonelli and Officer Esekia Afatasi of the Unified Police Department, metro gang unit. Marshal Simonelli testified as to the origins of the Norteño and Sureño gangs and the Utah subsets of those gangs. He also explained the Norteño meaning of several of Mr. Davila's tattoos. He further testified as to the significance of the phrase, "What's up my ese," explaining that if a gang member says the phrase to a member of a rival gang, it is considered a challenge. Finally, he testified regarding the importance of respect within gang culture. He explained that a gang member is expected to take action against anyone who disrespects his gang.

¶16 Officer Afatasi also provided expert testimony regarding gang culture. Like Marshal Simonelli, he explained the rivalry between the Norteño and Sureño gangs and their local subsets. He also provided similar testimony regarding the significance of referring to a gang member as "ese." Officer Afatasi testified more specifically about the Dog Town gang and explained the gang meaning of several of Mr. Gonzalez's tattoos and the gang symbols written on the blue bandanna, blue shorts, and hat found at Mr. Gonzalez's residence. He also testified that gang members are "always ready to fight" and are expected to be "battle ready" at all times.

¶17 On the third day of trial, the State rested and Mr. Gonzalez moved for directed verdict. He argued that the State had failed to meet its burden as to any of the elements of the murder and obstruction-of-justice charges. The trial court denied the motion, holding that the State had presented sufficient evidence to send the case to the jury. The jury thereafter convicted Mr. Gonzalez of murder, obstruction of justice, and possession of a dangerous weapon by a restricted person.

¶18 After the jury verdict, the trial proceeded to the gang-enhancement phase. The State entered into evidence the parties' stipulation that both Dog Town and Familia Por Siempre are criminal street gangs, that Mr. Gonzalez is a member of Dog Town, and that Mr. Davila was a member of a criminal street gang. The State then rested.

¶19 Once the jury had been excused to deliberate, Mr. Gonzalez moved to dismiss the gang-enhancement charge on the grounds that the gang-enhancement statute is unconstitutionally vague and overbroad. The State objected, arguing that the motion was untimely. The trial court denied the motion, stating that it "absolutely agree[d]" with the State that the motion was untimely. The court explained that the motion "could have been heard at any time" and did not depend on "waiting to see if there's a conviction." The trial court acknowledged that during the previous day of trial, Mr. Gonzalez's counsel had mentioned that she intended to make a motion if there was a conviction on the murder charge. The court had asked Mr. Gonzalez's counsel to supply it with any relevant case law, but counsel failed to do so. The trial court further explained that it may have addressed the motion had Mr. Gonzalez raised it "even shortly before trial," as it did with the motion to bifurcate the gang-enhancement charge. The trial court noted that it had set a "cutoff date for the motions to be filed," and that this motion was well past the cutoff. The jury subsequently convicted Mr. Gonzalez of the gang enhancement and, as a result, his sentence for the murder conviction was extended by five years.

¶20 Mr. Gonzalez appeals his murder and obstruction-of-justice convictions, as well as the gang enhancement. He argues that the trial court erred in denying his motion for directed verdict on the murder and obstruction-of-justice charges. He also argues that the admission of gang-related evidence was unfairly prejudicial, cumulative and lacked probative value where he had stipulated to gang membership. Finally, Mr. Gonzalez argues that the trial court erred in refusing to hear his challenge to the gang-enhancement statute. We have jurisdiction under Utah Code section 78A-3-102(3)(i).

## STANDARD OF REVIEW

¶21 We review a trial court's ruling on a motion for directed verdict for correctness. *Ferguson v. Williams & Hunt, Inc.*, 2009 UT 49, ¶ 19, 221 P.3d 205. "A trial court's decision to admit evidence under rule 403 of the Utah Rules of Evidence is reviewed for an abuse of

discretion." *State v. Kell*, 2002 UT 106, ¶ 29, 61 P.3d 1019. And trial courts may exercise discretion in managing their dockets; we therefore review a trial court's determination that a motion is untimely for an abuse of discretion. *State v. Bergeson*, 2010 UT App 281, ¶ 7, 241 P.3d 777.

## ANALYSIS

### I. THE TRIAL COURT CORRECTLY DENIED MR. GONZALEZ'S MOTION FOR DIRECTED VERDICT ON THE MURDER AND OBSTRUCTION-OF-JUSTICE CHARGES

¶22 Mr. Gonzalez first argues that the State presented insufficient evidence to show beyond a reasonable doubt that he did not act in self-defense when he stabbed Mr. Davila. Specifically, Mr. Gonzalez asserts that the State's evidence was insufficient to support a theory that he initiated the use of force, that he and Mr. Davila engaged in combat by agreement, or that Mr. Gonzalez acted unreasonably when he introduced deadly force into the altercation with Mr. Davila. He also argues that because there was insufficient evidence to convict him of murder, there was, by extension, insufficient evidence to convict him of obstruction of justice. He therefore contends that the trial court erred when it denied his motion for directed verdict on the murder and obstruction-of-justice charges.

¶23 The State argues that Mr. Gonzalez failed to preserve his insufficiency of the evidence claims. Specifically, the State asserts that when Mr. Gonzalez moved for directed verdict, he merely made blanket statements in which he listed the elements of murder and obstruction of justice and stated that the State had not met its burden of establishing those elements. The State argues that these objections were not sufficiently particular to preserve Mr. Gonzalez's argument that there was insufficient evidence to show that he had not acted in self-defense. The State also argues that even if Mr. Gonzalez did preserve his sufficiency of the evidence claims, the trial court did not err in denying Mr. Gonzalez's motion for directed verdict because the State introduced sufficient evidence to show that Mr. Gonzalez did not act in self-defense.

*A. Mr. Gonzalez Preserved His Sufficiency-of-the-Evidence Arguments*

¶24 We first address the State's preservation argument. "As a general rule, claims not raised before the trial court may not be raised on appeal." *State v. Holgate,* 2000 UT 74, ¶ 11, 10 P.3d 346. In deciding whether a motion made in the trial court was sufficient to preserve an argument made on appeal, we look to rule 12 of the

Utah Rules of Criminal Procedure, which requires a motion to "state succinctly and with particularity the grounds upon which it is made and the relief sought." Where the grounds upon which a motion is made before the trial court differ from the grounds argued on appeal, appellate courts will generally dismiss those arguments as unpreserved. *See State v. Meza*, 2011 UT App 260, ¶ 4, 263 P.3d 424 ("Utah courts require specific objections in order to bring all claimed errors to the trial court's attention to give the court an opportunity to correct the errors if appropriate." (internal quotation marks omitted)).

¶25   In this case, Mr. Gonzalez moved for directed verdict on the grounds that the State failed to meet its burden to show that the elements of murder and obstruction of justice had been met. Mr. Gonzalez did not specifically argue that the State failed to meet its burden of showing that he had not acted in self-defense when he used deadly force against Mr. Davila. Despite this failing, Mr. Gonzalez maintains that his self-defense argument was preserved because "[i]t was clear from Mr. Gonzalez's opening statement that this case was entirely about self-defense." Because Mr. Gonzalez "never challenged the evidence, including his own admission that he had stabbed [Mr. Davila]," he argues that the trial court was "'on notice of the asserted error' when counsel raised a specific challenge, supported by the evidence, in the form of a directed verdict."

¶26   We agree with Mr. Gonzalez. Because Mr. Gonzalez's sole defense to the murder charge was that he had acted in self-defense, it would have been clear to the trial court that his claim of self-defense was the basis for his motion for directed verdict. When the specific ground for an objection is clear from its context, the issue is preserved for appeal. *Cf. State v. Low*, 2008 UT 58, ¶ 17, 192 P.3d 867 ("Where . . . the specific ground for objection is not clear from the context[,] the theory cannot be raised on appeal." (second alteration in original) (internal quotation marks omitted)). When Mr. Gonzalez moved for directed verdict, the trial court would necessarily have understood from the context that he was asserting that the State had failed to meet its burden of showing that he had not acted in self-defense. We therefore conclude that Mr. Gonzalez preserved for appeal his motion for directed verdict on the murder charge. And because his motion for directed verdict on the obstruction-of-justice charge turned on his challenge to the murder charge, his claim of error on the obstruction charge was preserved as well.

*B. The State Presented Sufficient Evidence that Mr. Gonzalez Did Not Act in Self-Defense and Obstructed Justice*

¶27   Having held that Mr. Gonzalez preserved his sufficiency of the evidence claims, we now address their merits. A defendant must overcome a substantial burden on appeal to show that the trial court erred in denying a motion for directed verdict. We will uphold a trial court's denial of a motion for directed verdict "based on a claim of insufficiency of the evidence" if, when viewed in the light most favorable to the State, "some evidence exists from which a reasonable jury could find that the elements of the crime had been proven beyond a reasonable doubt." *State v. Montoya*, 2004 UT 5, ¶ 29, 84 P.3d 1183 (internal quotation marks omitted). Mr. Gonzalez must therefore show that, when viewed in the light most favorable to the State, no evidence existed from which a reasonable jury could find beyond a reasonable doubt that Mr. Gonzalez did not act in self-defense or that he obstructed justice. Mr. Gonzalez has not satisfied this burden.

1. The Evidence Was Sufficient to Support a Finding that Mr. Gonzalez Was the Aggressor and Thus Did Not Act in Self-Defense

¶28   Under Utah's self-defense statute, "[a] person is justified in . . . using force against another when and to the extent that the person reasonably believes that force . . . is necessary to defend the person . . . against another person's imminent use of unlawful force." UTAH CODE § 76-2-402(1)(a). But this affirmative defense is not available if the defendant "was the aggressor." *Id.* § 76-2-402(2)(a)(iii). We have defined "aggressor" as "one who willingly and knowingly initially provokes a combat or does acts of such a nature as would ordinarily lead to combat." *State v. Schoenfeld*, 545 P.2d 193, 196 (Utah 1976).

¶29   When looking at the issue of aggression, evidence of a "defendant's verbal and physical acts at the scene of the homicide [is] sufficient" to show that the defendant was the aggressor. *State v. Starks*, 627 P.2d 88, 91 (Utah 1981). In *Starks*, the accused armed himself with a gun and went to a location where he knew he would find the victim. *Id.* Upon finding the victim and believing him to be armed, the defendant verbally threatened the victim, pulled out the gun, struggled to figure out how to operate the gun, fired shots, and chased after the victim. *Id.* at 89–90. At trial, a witness testified that the victim never produced a weapon, but only "jumped around" asking the defendant to put away the gun. *Id.* at 91. Based on the

defendant's conduct at the time of the altercation, we determined that a jury instruction regarding aggression was justified. *Id.*

¶30 In this case, the evidence of Mr. Gonzalez's physical and verbal actions is likewise sufficient to support a finding that he was the aggressor. The evidence of Mr. Gonzalez and Mr. Davila's interactions outside Kohl's showed that Mr. Davila insulted Mr. Gonzalez's gang, supporting the State's argument that Mr. Gonzalez had a motive to attack Mr. Davila. The expert testimony regarding the importance of respect and battle readiness in gang culture supported the State's claim that Mr. Gonzalez instigated a fight with Mr. Davila to defend his gang's reputation.

¶31 The video surveillance evidence also supports the conclusion that Mr. Gonzalez was the aggressor. It showed that one minute after Mr. Davila went into the Kohl's restroom, Mr. Gonzalez entered the customer service area, gave Alexis a one-armed hug while maintaining the other hand in his pocket, and then entered the restroom. Mr. Gonzalez then confronted Mr. Davila in the restroom while blocking the exit. When viewed in the light most favorable to the State, this evidence reasonably supports the conclusion that Mr. Gonzalez knew Mr. Davila was in the restroom, that he entered the restroom intending to fight Mr. Davila, and that he planned to use the knife in his pocket. And the eyewitness testimony supports this conclusion as well. The testimony of the customer who heard Alexis tell Mr. Gonzalez to "just let it go" suggests that Alexis knew Mr. Gonzalez was upset by Mr. Davila's insults and planned to retaliate. Moreover, Miguel's testimony that, upon entering the restroom, Mr. Gonzalez asked Mr. Davila, "What's up ese," showed Mr. Gonzalez's intent to challenge Mr. Davila.

¶32 Finally, the State's evidence of phone records showing numerous texts and phone calls between members of Dog Town before and during the fight, including the text stating, "flacoz getting down," support the conclusion that Mr. Gonzalez planned to initiate a fight with Mr. Davila and shared that plan with other Dog Town members. This conclusion is further supported by the fact that members of Dog Town arrived at Kohl's and yelled disparaging remarks to Mr. Davila shortly after the altercation ended.

¶33 When viewed as a whole and in the light most favorable to the State, this evidence was sufficient to show that Mr. Gonzalez had a motive to fight Mr. Davila, that he planned to fight Mr. Davila and shared his plan with fellow gang members, and that he confronted Mr. Davila in the restroom to initiate the fight. Based on this

evidence, a reasonable jury could find beyond a reasonable doubt that Mr. Gonzalez was the aggressor and thus did not act in self-defense.[5] We therefore affirm the trial court's denial of Mr. Gonzalez's motion for directed verdict on the murder charge.

2. Because the Evidence Was Sufficient to Show that Mr. Gonzalez Committed the Crime of Murder, the Evidence Was Also Sufficient to Show that Mr. Gonzalez Obstructed Justice

¶34 Mr. Gonzalez also appeals the denial of his motion for directed verdict on the obstruction-of-justice charge. A person obstructs justice if the person "alters, destroys, conceals, or removes any item . . . with intent to hinder, delay, or prevent the investigation, apprehension, prosecution, conviction, or punishment of any person regarding conduct that constitutes a criminal offense." UTAH CODE § 76-8-306(1). Mr. Gonzalez claims that because he acted in self-defense, no criminal offense occurred and the evidence of him disposing of his shirt was therefore insufficient to support a conviction for obstruction of justice. However, because we affirm the denial of his motion for directed verdict on the murder charge, this argument fails. Where the evidence was sufficient to show that Mr. Gonzalez did not act in self-defense and therefore committed the crime of murder, the evidence was also sufficient to show that he obstructed justice by destroying an item relevant to the investigation of that crime. The trial court therefore correctly denied his motion for directed verdict on this charge.

## II. THE TRIAL COURT DID NOT ABUSE ITS DISCRETION WHEN IT ALLOWED THE STATE TO PRESENT GANG-RELATED EVIDENCE DURING THE GUILT PHASE OF THE TRIAL

¶35 Mr. Gonzalez next argues that the trial court abused its discretion when it permitted the State to admit "cumulative and unfairly prejudicial" gang-related evidence at trial. Because both parties stipulated that Mr. Gonzalez and Mr. Davila were members of gangs and because the trial court agreed to bifurcate the gang-enhancement charge, Mr. Gonzalez contends that "testimony concerning his gang involvement would have no probative value" during the murder phase of trial. The State argues that the gang-

---

[5] Because the evidence was sufficient to support a finding that Mr. Gonzalez was the aggressor, we need not address whether the evidence was also sufficient to show that Mr. Gonzalez and Mr. Davila engaged in combat by agreement or that Mr. Gonzalez acted unreasonably by introducing deadly force.

related evidence was neither cumulative nor overly prejudicial but was instead highly relevant to a case against a gang member who was "charged with intentionally murdering a rival gang member for reasons relating to his gang." Specifically, the State argues that the gang-related evidence was highly probative in showing intent, motive, and lack of self-defense. We agree with the State.

¶36 Generally, relevant evidence is admissible. UTAH R. EVID. 402; *see also State v. Dunn*, 850 P.2d 1201, 1221–22 (Utah 1993) (explaining that this court "indulge[s] a presumption in favor of admissibility"). Rule 403 of the Utah Rules of Evidence provides an exception to the general rule of admissibility by permitting courts to "exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice . . . or needlessly presenting cumulative evidence." Evidence is unfairly prejudicial if it has "an undue tendency to suggest decision on an improper basis." *State v. Maurer*, 770 P.2d 981, 984 (Utah 1989) (internal quotation marks omitted). But even if a trial court improperly admits unfairly prejudicial or cumulative evidence, we will not overturn a jury verdict based on that evidence "if the admission of the evidence did not reasonably effect the likelihood of a different verdict." *State v. Houskeeper*, 2002 UT 118, ¶ 26, 62 P.3d 444.

¶37 Application of rule 403 in the context of gang-related evidence presents a particularly difficult challenge because, though often probative as to issues like motive or intent, gang-related evidence may lead to the potential prejudice of "guilt by association." *State v. High*, 2012 UT App 180, ¶ 27, 282 P.3d 1046 (internal quotation marks omitted). But even where gang-related evidence is prejudicial, it is not necessarily *unfairly* prejudicial and therefore should be admitted where it has high probative value. *See United States v. Santiago*, 643 F.3d 1007, 1011 (7th Cir. 2011) (stating that admission of gang evidence must be made with care and thoroughness, but the risk of prejudice does not render gang evidence automatically inadmissible as it may be highly probative in establishing motive and other elements of crimes.); *United States v. Irvin*, 87 F.3d 860, 864 (7th Cir. 1996) (stating that in the appropriate context "gang evidence has probative value warranting its admission over claims of prejudice").

¶38 In addition to its potential for being unfairly prejudicial under rule 403, gang-related evidence may also implicate rule 404 of the Utah Rules of Evidence, which prohibits the use of character evidence or evidence of prior bad acts to "prove that on a particular occasion the person acted in conformity with the character or trait."

UTAH R. EVID. 404(a)(1), (b)(1). Indeed, evidence of gang membership or gang activity would be improper under rule 404 if it is used "as a backdoor means of introducing character evidence by associating the defendant with the gang and describing the gang's bad acts." *State v. Torrez*, 210 P.3d 228, 235 (N.M. 2009) (internal quotation marks omitted).

¶39 But mere evidence of gang affiliation that does not relate to prior bad acts does not violate rule 404's prohibition against character evidence. *See United States v. Hodges*, 315 F.3d 794, 801 (7th Cir. 2003) ("Without any testimony of particular prior bad acts [the defendant] participated in as a gang member, we find that evidence of his mere affiliation with the gang does not fall under Rule 404(b)."). Moreover, gang-related character or bad-acts evidence will not violate rule 404 if it is admitted for a reason other than to show conformity with that character trait on a particular occasion.

¶40 While trial courts must view gang-related evidence with caution, they may admit such evidence when it is introduced for a proper purpose and under the right circumstances. Examples of gang-related evidence that trial courts have properly admitted include evidence that a killing was the product of a conflict between rival gangs, evidence showing a key witness's fear of gang retaliation, gang evidence explaining the circumstances surrounding a crime and the victim's and the defendant's intent, and evidence demonstrating motive based on a long-standing grudge between rival gangs. *See High*, 2012 UT App 180, ¶ 23 (collecting cases where gang-related evidence was properly admitted).

¶41 Particularly relevant to this case, in *State v. Cristobal*, the court of appeals affirmed the admission of evidence showing a gang's territory, which the State presented to show motive and to support its argument that the defendant was the aggressor in an altercation that took place within the gang's territory. 2012 UT App 181, ¶ 4, 282 P.3d 1064. The court of appeals reasoned that the evidence, though potentially prejudicial, was probative in that it explained "why gang members might congregate in the area and exhibit hostility toward intruding nonmembers." *Id.*

¶42 In this case, Mr. Gonzalez objects to the trial court's admission of gang-related evidence as unfairly prejudicial. Specifically, Mr. Gonzalez objects to the photographic exhibits showing gang-related tattoos and apparel, the gang expert testimony, and witnesses' references to Mr. Gonzalez as "Dog Town" and "Dog Town guy." Mr. Gonzalez argues that this

evidence was "not necessary, probative, or helpful" where he had stipulated to his and Mr. Davila's gang membership and where the trial had been bifurcated to separate the murder charge from the gang-enhancement charge.

¶43 We disagree that the stipulation and bifurcation rendered the gang-related evidence irrelevant or unfairly prejudicial. Rather, the gang-related evidence was highly relevant to the State's theories of motive and intent and to Mr. Gonzalez's claim of self-defense. The evidence of Mr. Gonzalez's gang-related tattoos and clothing was relevant to establishing his loyalty to his gang and his willingness to publicly display his gang membership. And evidence of his gang loyalty suggested that, as a committed member of Dog Town, Mr. Gonzalez was highly motivated to retaliate against an insult to his gang.

¶44 Mr. Gonzalez also objects to the gang experts' testimony, arguing that it was both unfairly prejudicial and needlessly cumulative. But both Marshal Simonelli and Officer Afatasi testified to unique and relevant issues. Although their testimony overlapped in some respects—both experts testified about the rivalry between the Norteño and Sureño gangs, the signs and symbols of the gangs, and the meaning of the phrase, "What's up my ese,"—they each had a different focus. Specifically, Marshal Simonelli testified about Mr. Davila's gang affiliation, whereas Officer Afatasi focused more on Dog Town and Mr. Gonzalez's membership in that gang. And while each testified about gang culture, they testified as to different aspects of that culture: Marshal Simonelli spoke to the importance of respect among gang members and Officer Afatasi testified about battle readiness. All of this testimony assisted the jury in understanding the visual cues, signs, actions, and culture that would motivate a gang-related altercation. Such testimony was therefore highly probative of the State's theory that Mr. Gonzalez had a gang-related motive to attack Mr. Davila, that he instigated the fight, and that he therefore did not act in self-defense.

¶45 Mr. Gonzalez particularly objects to what he characterizes as the prejudicial effect of Officer Afatasi's testimony regarding gang members' battle readiness. We acknowledge that this evidence was prejudicial. But the State had a noncharacter purpose for admitting it: to show that even if he did not instigate the fight, Mr. Gonzalez engaged in combat by agreement, thereby discrediting his self-defense argument. *See* UTAH CODE § 76-2-402(2)(a)(iii) (describing the combat by agreement exception to self-defense). This testimony therefore did not violate rule 404's prohibition on character

testimony. And because the State's theory in this case depended on proving a lack of self-defense, this expert testimony was highly probative. We therefore cannot say that the trial court abused its discretion in finding that the probative value of this evidence outweighed its risk of unfair prejudice.

¶46 Finally, Mr. Gonzalez objects to Alma's and Miguel's testimony, during which they referred to Mr. Gonzalez as "Dog Town" or "Dog Town guy." But when Alma and Miguel testified, Mr. Gonzalez had not yet been identified as the assailant. Indeed, neither Alma nor Miguel knew Mr. Gonzalez's name. Their use of the term "Dog Town guy" was merely their way of referring to the man who had the Dog Town tattoo. These references served to identify Mr. Gonzalez as the man Alma and Miguel saw outside of Kohl's and later in the Kohl's restroom. Although this testimony may have had the prejudicial effect of intertwining Mr. Gonzalez's identity with his gang affiliation, it did not rise to the level of unfair prejudice. Where the State presented other substantial evidence of Mr. Gonzalez's guilt, Alma and Miguel's references to Mr. Gonzalez as "Dog Town guy" had little if any effect on the outcome of the trial, other than to identify Mr. Gonzalez as the assailant. This evidence was therefore not unfairly prejudicial because it did not have "an undue tendency to suggest decision on an improper basis." *Maurer*, 770 P.2d at 984 (internal quotation marks omitted).

¶47 In sum, because the State's case was dependent on gang-related evidence to show motive and intent and to disprove Mr. Gonzalez's self-defense argument, that evidence was highly probative. Although the gang evidence was prejudicial in that it showed Mr. Gonzalez's affiliation with and commitment to a criminal organization, the evidence was not *unfairly* prejudicial where the State's case hinged on gang rivalries. The trial court therefore did not abuse its discretion in admitting such evidence.

## III. THE TRIAL COURT DID NOT ABUSE ITS DISCRETION BY REJECTING AS UNTIMELY MR. GONZALEZ'S POST-TRIAL CHALLENGE TO THE CONSTITUTIONALITY OF THE GANG-ENHANCEMENT STATUTE

¶48 Mr. Gonzalez's final argument is that the trial court abused its discretion when it dismissed as untimely his post-trial constitutional challenge to the gang-enhancement statute.[6] We

---

[6] The gang-enhancement statute provides that a person who commits one of the enumerated crimes, including murder,

(continued...)

disagree. Trial courts have broad discretion "to manage [their] docket[s] and set firm deadlines for motion practice." *State v. Bergeson*, 2010 UT App 281, ¶ 7, 241 P.3d 777. This discretion "is not limited by the importance or constitutional nature of the motion at issue." *Id.* Where a party brings a motion after the deadline set by the trial court, the Utah Rules of Criminal Procedure allow trial courts to consider the motion waived. UTAH R. CRIM. P. 12(f) (providing that "[f]ailure of the defendant to timely raise defenses or objections . . . at the time set by the court shall constitute waiver thereof"). Recognition of the trial court's prerogative to manage its docket serves a number of beneficial interests, including promoting judicial efficiency and economy, creating a predictable system of advocacy, fostering finality in convictions, and reducing litigation expenses. *See State v. Belgard*, 811 P.2d 211, 214 (Utah Ct. App. 1991).

¶49   In this case, Mr. Gonzalez brought his motion to dismiss the gang-enhancement charge on the final day of trial, after the jury had convicted him of all other charges. In denying the motion as untimely, the trial court reasoned that Mr. Gonzalez's ability to bring the motion was not dependent on whether Mr. Gonzalez was convicted of murder. Rather, Mr. Gonzalez could have brought the motion at any time. Moreover, Mr. Gonzalez failed to adhere to the trial court's request that he supply the court with legal authority supporting his motion.

¶50 Although the trial court had previously granted Mr. Gonzalez's untimely motion to bifurcate the gang-enhancement charge, the court's willingness to entertain one untimely motion did not open the door to all untimely motions. Instead, the trial court gave both parties ample opportunity to present issues in a timely manner by establishing motion cutoff dates, demonstrating a willingness to consider even untimely motions raised prior to trial (as it did with the motion to bifurcate), and inquiring throughout

---

[6](...continued)
is subject to an enhanced penalty for the offense . . . if the trier of fact finds beyond a reasonable doubt that the person acted: (a) in concert with two or more persons; (b) for the benefit of, at the direction of, or in association with any criminal street gang as defined in Section 76-9-802; or (c) to gain recognition, acceptance, membership, or increased status with a criminal street gang as defined in Section 76-9-802.

UTAH CODE § 76-3-203.1(2).

LEE, J., concurring in part and concurring in the judgment

trial if the parties wished to address any matters to the court. But Mr. Gonzalez waited until the eleventh hour to bring his motion without demonstrating good cause for doing so. The trial court therefore did not abuse its discretion in denying the motion as untimely.

**CONCLUSION**

¶51 We affirm Mr. Gonzalez's convictions for obstruction of justice and murder with a gang enhancement. The trial court properly denied Mr. Gonzalez's motion for directed verdict because the evidence was sufficient for a reasonable jury to find beyond a reasonable doubt that Mr. Gonzalez was the aggressor and therefore did not act in self-defense when he stabbed Mr. Davila. The trial court also correctly denied Mr. Gonzalez's motion for directed verdict on the obstruction-of-justice charge. The trial court did not abuse its discretion in admitting gang-related evidence under rule 403 because its probative value was not substantially outweighed by a danger of unfair prejudice, nor was it needlessly cumulative. Finally, the trial court did not abuse its discretion in denying as untimely Mr. Gonzalez's post-trial challenge to the constitutionality of the gang-enhancement statute because Mr. Gonzalez did not show good cause for failing to bring the motion in a timely manner.

————————

JUSTICE LEE, concurring in part and concurring in the judgment:

¶52 I concur in the majority's opinion affirming the district court's admission of gang-related evidence and rejecting Gonzalez's constitutional challenge to the gang enhancement statute. I also agree with the ultimate disposition of Gonzalez's challenge to the sufficiency of the evidence (affirmance). I write separately, however, because I find Gonzalez's argument on that point unpreserved, and would not reach its merits.

¶53 Under our preservation doctrine, we do not reach the merits of an argument on appeal unless the appellant "(1) *specifically* raise[d] the issue [in the trial court], (2) in a timely manner, and (3) support[ed] the claim with evidence and relevant legal authority." *Salt Lake City Corp. v. Jordan River Restoration Network*, 2012 UT 84, ¶ 27, 299 P.3d 990 (emphasis added) (internal quotation marks omitted). The majority concedes that "Gonzalez did not *specifically* argue that the State failed to meet its burden of showing that he had not acted in self-defense" in his directed verdict motion. *Supra* ¶ 25 (emphasis added). Yet the court asserts that the trial court was "necessarily" aware that this was the basis of the motion because

LEE, J., concurring in part and concurring in the judgment

Gonzalez's theory of the case was self-defense, and on that basis concludes that the matter was preserved. *Supra* ¶ 26.

¶54 I disagree. At the close of the evidence, defense counsel moved for a directed verdict on these grounds:

> [The State has] not met [its] burden in establishing that this was knowingly, intentionally done . . . , that Mr. Gonzalez intended to cause serious bodily injury and committed an act clearly dangerous to human life causing the death, that he acted under circumstances evidencing a depraved indifference to human life, knowingly engaged in conduct which created a grave risk of death to another, thereby causing the death of another. *None of those elements* have been met with the evidence that has come over the last couple of days.

(Emphasis added). Gonzalez's motion was about *mens rea*. Neither the motion nor the State's response had anything to do with self-defense. The State's response to the motion was along the same lines. In the prosecution's words, "when you stab somebody seven times, especially if it's in the torso and the face . . . you're intending to cause serious bodily injury death or evidencing a depraved indifference."

¶55 Both parties' arguments thus centered on the issue of *mens rea*, and said nothing of self-defense. The trial court accordingly did not have a "meaningful opportunity" to address the issue. *Hill v. Superior Property Mgmt. Servs. Inc.*, 2013 UT 60, ¶ 46, 321 P.3d 1054. I would affirm on that basis, without reaching the merits of the sufficiency of the evidence argument.