**2025 UT App 135**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
JOSEPH PALMER,
Appellant.

Opinion
No. 20230724-CA
Filed September 5, 2025

Third District Court, Salt Lake Department
The Honorable Todd M. Shaughnessy
No. 221907346

Sarah J. Carlquist, Attorney for Appellant

Derek E. Brown and Natalie M. Edmundson,
Attorneys for Appellee

JUDGE AMY J. OLIVER authored this Opinion, in which
JUDGES DAVID N. MORTENSEN and JOHN D. LUTHY concurred.

OLIVER, Judge:

¶1 On a summer day, an adult male (Driver) drove past two teenage boys—Joseph Palmer and a friend (Friend)—who were walking alongside the road. Driver inexplicably flipped a U-turn, crossed the center line, and stopped his truck next to the boys. As Driver attempted to get out of his truck, Palmer fatally shot him four times with a gun he had been carrying in his backpack. Palmer was charged in juvenile court with one count of murder and six additional charges. After the case was transferred to district court, a jury convicted Palmer on one count of murder, three counts of felony discharge of a firearm, and one count of obstructing justice. On appeal, Palmer asserts that the evidence

was insufficient to disprove his claim of self-defense.[1] Because we conclude that the State produced some evidence to disprove Palmer's claim of self-defense, we affirm his convictions.

## BACKGROUND[2]

### *The Shooting*

¶2    At approximately 8 p.m. on July 6, 2021, fifteen-year-old Palmer and Friend were walking northbound on the sidewalk on the west side of a residential road near a park. Friend was wearing a red t-shirt, a red bandana, and slide sandals and was pushing a red bicycle. Palmer was wearing a white t-shirt and black pants and carried a backpack. A man who lived in the neighborhood (Eyewitness) observed Palmer and Friend walking.

¶3    A white truck drove northbound by Palmer and Friend. After the truck drove by, Palmer and Friend crossed to the east side of the street and continued walking northbound. The truck then quickly turned around and "cross[ed] the middle, center of the street" and drove southbound in the northbound lane until it stopped in front of Palmer and Friend. Driver was the only occupant of the truck. When he approached Palmer and Friend, Driver said, "What's up, nigger?" At first, Eyewitness believed that Driver, Palmer, and Friend were "friends," but he quickly realized the interaction was not friendly when he saw Driver

---

1. The claim of self-defense applied only to the murder and felony discharge of a firearm charges. Palmer does not appeal his conviction for obstructing justice.

2. "On appeal from a jury trial, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly, and we present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Herrera*, 2025 UT App 1, n.2, 563 P.3d 416 (cleaned up).

reach out the window to try to open the truck door from the outside and saw Friend "kick the truck" to stop him. Eyewitness could tell the three were having a conversation but could not hear what they were saying. After Friend kicked and placed his palm on the truck door to keep it closed, Eyewitness observed Palmer, who was standing toward the bed of the truck, open his backpack and pull out a gun. Palmer fired four shots in the direction of Driver; one bullet hit Driver near his left eye, killing him. Palmer and Friend fled on foot. Approximately twenty seconds elapsed from the time the truck turned around to when Palmer and Friend fled.

¶4      Driver's truck rolled into the nearby park. Several bystanders tried to help. One bystander (Bystander 1) noticed the truck was in gear, a lot of broken glass and blood inside the truck, and Driver still in his seatbelt but slouched over. Another bystander (Bystander 2) saw the truck roll into the park but did not see anyone in the driver's seat. A police officer (Officer) arrived on scene and found Driver "slumped over into the passenger seat with blood on his face and the seat." He also saw bullet holes in the "driver's side truck bed area" and in the windshield with the back window "shot out." Officer did not find a gun or any weapons in the truck.

¶5      After Palmer fired the shots, he and Friend ran toward Friend's house. Eyewitness followed them and called the police. Palmer and Friend entered the house through the front door. Friend changed his shirt, and Palmer took his shirt off. Palmer and Friend went into the backyard, where Palmer repeatedly called his girlfriend because he wanted her to pick him up. Palmer also texted his girlfriend, "They're everywhere" and "I'm fucked." Palmer jumped over the fence in Friend's backyard and hid in a driveway in front of a truck. A neighbor (Neighbor) observed Palmer place something underneath the truck. When officers arrived, they found Palmer sitting in front of the truck with his backpack and found a 9-mm handgun wrapped in a white shirt

under the truck. Palmer and Friend were arrested and taken to a police station for questioning. In their interviews, both Palmer and Friend denied knowing anything about the shooting.

*The Investigation*

¶6   A forensic scientist (Forensic Scientist) processed Driver's truck for prints and DNA. Three latent prints were pulled from the outside of the driver's side door. One of the prints belonged to Driver, and one print belonged to Friend. The print belonging to Friend was a partial palmprint that was pulled from the outside of the driver's side door just between the window and door handle. The third print was not identified.

¶7   The medical examiner (Medical Examiner) completed an autopsy of Driver that revealed Driver died from a single gunshot wound that entered near his left eye and exited out of the right back of his head. At the time of his death, Driver's blood alcohol content was .11, more than double the legal limit, and he also had benzocaine, "a byproduct of cocaine" in his system. Medical Examiner estimated Driver had used cocaine within two hours before his death.

*The Charges and Juvenile Court Proceedings*

¶8   Palmer was initially charged in juvenile court with one count of murder, three counts of felony discharge of a firearm, one count of obstructing justice, one count of possession by a minor of a handgun, and one count of possession of drug paraphernalia. The State moved to transfer the case to district court, and after a four-day evidentiary hearing, the juvenile court granted the motion. In district court, the case proceeded to trial on one count of murder, three counts of felony discharge of a firearm, and one count of obstructing justice.

*The Trial*

¶9 The State called multiple witnesses, including Eyewitness, Bystander 1, Bystander 2, Officer, Neighbor, the crime scene investigator (Investigator), Forensic Scientist, Medical Examiner, a firearms forensic scientist (Firearms Expert), and a detective (Detective). Bystander 1, Bystander 2, Officer, Neighbor, and Forensic Scientist testified as described above.

¶10 Eyewitness testified that he was standing between forty-five and sixty feet away when he saw Driver pull up to Palmer and Friend. Eyewitness testified that when Driver pulled up, Friend was closest to the driver's side door, and Palmer was standing closer to the truck bed. Eyewitness did not see Driver with a gun or weapon and did not see him lean over or reach for anything in the truck. He also testified that Palmer did not rack the gun before shooting.

¶11 Investigator discussed retrieving the gun from under the truck next to where Palmer was hiding. Investigator also testified that a red bicycle, slide shoes, and four spent 9mm casings were found near the site of the shooting. Investigator examined Driver's truck and noted that the "back driver's side window . . . was broken out" and there were two defects in the front windshield.

¶12 Medical Examiner testified to Driver's cause of death and levels of intoxication as described above. On cross-examination, Medical Examiner agreed cocaine and alcohol could "possibly" contribute to a person's willingness to engage in aggressive behavior and could induce violent behavior, but he testified he would not expect violent behavior at Driver's level of intoxication.

¶13 Firearms Expert evaluated the gun and testified that the only part of the gun that was not functioning properly was the magazine safety, which would allow the gun to be fired even without a magazine. Firearms Expert also testified that two bullet

samples and the four cartridge casings found at the scene of the shooting had been fired from the gun that Investigator retrieved from under the truck where Palmer was hiding.

¶14 During Detective's testimony, the State played surveillance footage from several sources that captured the events immediately before and after the shooting. The footage included the truck making a U-turn to approach Palmer and Friend, Palmer and Friend running to Friend's house after the shooting, and Palmer jumping the fence in Friend's backyard. Detective also testified about the text messages and calls from Palmer to his girlfriend after the shooting, and about texts between Palmer and his aunt indicating that Palmer was attempting to obtain a firearm a month before the shooting.

¶15 After the State's case-in-chief, the defense called two witnesses, Friend and Palmer. Friend testified that when he and Palmer were walking northbound, Driver passed them "in an aggressive manner," stared at them with "malic[ious] intent," and asked them if they "were part of a gang," which concerned Friend and Palmer. Friend further testified that after Driver passed them, he made a U-turn and drove on the wrong side of the road before stopping in front of Friend and Palmer. This made Friend very concerned Driver was going to shoot them in a drive-by or otherwise confront them.

¶16 Friend testified that when Driver stopped in front of them, Friend was standing by the front wheelbase and, contrary to the scene as Eyewitness described it, Palmer was standing behind Friend toward the front of the truck. Friend stated that after Driver stopped in front of them, Driver called them "racial slurs" and asked them if they "wanted to die." Friend said he did not think Driver was joking, and feared his life was in danger because Driver was going to get a "gun or a knife or any weapon." Friend testified that when Driver tried to open the door, Friend "put [his] hand and [his] foot" "against the door, to close it." Friend also

testified that when Palmer shot Driver, Driver was reaching down for something which Friend believed would be a weapon. Friend explained that he began running after Palmer fired the shots. He said that Palmer soon caught up to him, and they went to Friend's house. Friend testified that he lied during his police interview when he said he did not know anything about the shooting and did so because he did not trust the police.

¶17 On cross-examination, Friend admitted he lied to the lieutenant who interviewed him earlier that morning[3] when he said that he and Palmer were trying to play basketball in the park, which had no basketball courts. The State also had Friend look at a diagram he drew during his meeting that morning of where he and Palmer were standing when the shooting occurred. On the diagram, Friend had marked that he was closer to the driver door of the truck and Palmer was closer to the back of the truck, contrary to his testimony given during direct examination. On redirect, Friend testified that at first Palmer was standing behind him but that he did not really see where Palmer was standing when he fired for the first time.

¶18 Palmer testified in his own defense. He testified that at the time of the shooting, he was "off and on" "homeless" and would often sleep on his grandmother's living room couch because his father had passed away and his mother "was a drug addict." Palmer testified that he and Friend were going to play basketball but admitted neither of them had a basketball with them. Palmer testified that as he and Friend were walking down the street, Driver drove by them and looked back toward them, which concerned him because a few days earlier a car drove by him and a different friend and then turned around and shot at them. So when Driver made a U-turn and drove on the wrong side of the

---

3. Friend was interviewed by the State the morning he testified because defense counsel received Friend's contact information only the night before.

street toward them, Palmer's "first instinct was to prepare" himself by taking the backpack that had his gun in it off his shoulder. Palmer testified that he knew he was not supposed to have a gun but had one to protect himself. According to Palmer, when the truck approached them, Driver was "hanging out" of the truck with his head "almost out the window," and Palmer was scared Driver was going to shoot them or hit them with the truck.

¶19 Palmer testified that when the truck stopped, he was standing by the truck's front bumper and Friend was standing two to three feet in front of him and closer to the driver door. Palmer said that when Driver stopped, he asked them if they were in a gang and if they wanted to die. Palmer said he was in shock and "just froze" until he saw Driver reach for something he believed was a gun or weapon, and when Driver came back up, Palmer shot at him "until [Palmer] felt [he] was safe." Palmer explained that once he started shooting, the truck began to lurch forward, but he kept firing until the truck was going away from him. Palmer said he then started running toward Friend's house. Palmer testified that when he got to Friends's house, he changed his clothes, called his girlfriend to pick him up, and tried to get rid of the gun because he was scared, did not know what to do, and did not want to get in trouble. Palmer admitted that when he was arrested, he lied to the police about his involvement in the shooting because he "didn't trust them" and did not think they would believe him.

¶20 During cross-examination, Palmer testified that he had never seen Driver or his truck before. He reiterated that he obtained a gun for protection because he had been shot at on several occasions, including two days prior to the confrontation with Driver. Palmer explained he did not report that incident to the police, but he believed he had reported a different incident to the police in the past. On redirect, Palmer testified that the whole incident occurred extremely fast and he did not have time to

process anything or think about what would happen based on different actions he could take.

¶21 After the defense rested, the court read a stipulation to the jury that the Salt Lake Metro Gang Unit determined that Driver, Palmer, and Friend were not gang associates or members. The court then read the jury instructions, which included instructions on perfect self-defense, imperfect self-defense, and the special mitigation defense of extreme emotional distress.

¶22 In closing, the State argued that it had met its burden of disproving both perfect and imperfect self-defense beyond a reasonable doubt: "[Driver] did not have a weapon. The car was at a standstill. It was not going to run over anybody. In fact, [Driver] was still in his seat belt. There is no way that self-defense or defense of others applies." The State concluded by arguing there was "no evidence to support a reasonable belief that [Palmer] could use lethal force in defense of himself or" Friend.

¶23 During the defense's closing, defense counsel (Counsel) reminded the jury that Palmer was the victim of a drive-by shooting two days before the encounter with Driver and, therefore, was rightfully terrified when an adult stranger who was under the influence of alcohol and drugs, drove by while staring at him, and then flipped a U-turn to come back and confront him and Friend. Counsel continued that Driver had no reason to drive up to Palmer and Friend and that the situation would be frightening for any fifteen-year-old. Counsel argued the jury should believe Friend's testimony because his palm print on the door frame was exactly where one would expect a palm print to be if someone was trying to prevent a door from opening. Counsel further argued that Palmer's actions were "consistent with preventing what appeared to be an aggravated assault," Palmer had the "right to defend himself and to use deadly force to prevent an aggravated assault," and it did not matter that Driver did not actually have a weapon.

¶24 During the State's rebuttal closing, the prosecutor encouraged the jury to question Palmer's and Friend's credibility because they both admitted they had lied to the police, and both had "skin in the game," unlike the State's witnesses.[4] The State further argued the physical evidence was consistent with Eyewitness's testimony about where Palmer was standing near the truck. The State reiterated that the evidence did not support self-defense because there was "no imminent use of unlawful force," "[n]o gun," and "no necessity to prevent death or serious bodily injury, because [there was] no threat of it." The State concluded that it was unreasonable for Palmer to believe it was necessary to use lethal force on Driver.

¶25 After the jury began deliberating, the State pointed out that Counsel had reserved his directed verdict motion but never "got around to making the motion." The court allowed Counsel to move for a directed verdict before the jury returned with its verdict. The court denied the motion.

¶26 The jury convicted Palmer as charged and found the State disproved Palmer's claims of perfect and imperfect self-defense beyond a reasonable doubt. Palmer was sentenced to fifteen years to life in prison for the murder conviction, three years to life for each of the felony discharge convictions, and one to fifteen years for the obstructing justice conviction. The court ordered the sentences to run concurrently.

ISSUE AND STANDARD OF REVIEW

¶27 Palmer asserts the district court erred in denying his motion for a directed verdict because the State did not produce sufficient evidence to disprove his perfect self-defense claim. Alternatively, Palmer asks this court to reverse his murder conviction and enter a conviction for manslaughter because the

---

4. Friend was adjudicated in juvenile court for obstructing justice.

State did not produce sufficient evidence to disprove his imperfect self-defense claim. This court reviews a "district court's denial of a motion for directed verdict for correctness." *State v. Dever*, 2022 UT App 35, ¶ 29, 508 P.3d 158 (cleaned up). "However, where a defendant challenges the denial of a motion for a directed verdict based on the sufficiency of the evidence, the applicable standard of review is highly deferential" to the jury verdict. *Id.* (cleaned up). "We will uphold the district court's denial if, when viewed in the light most favorable to the State, some evidence exists from which" the State could prove beyond a reasonable doubt that the defendant did not act in self-defense. *Id.* (cleaned up).

## ANALYSIS

¶28 Palmer "must overcome a substantial burden on appeal to show that the [district] court erred in denying [his] motion for directed verdict." *State v. Gonzalez*, 2015 UT 10, ¶ 27, 345 P.3d 1168. Specifically, Palmer must show that, "when viewed in the light most favorable to the State, no evidence existed from which a reasonable jury could find beyond a reasonable doubt that [Palmer] did not act in self-defense." *Id.*

¶29 Utah law permits an individual to use

> force intended or likely to cause death or serious bodily injury only if the individual reasonably believes that force is necessary to prevent death or serious bodily injury to the individual or another individual as a result of imminent use of unlawful force, or to prevent the commission of a forcible felony.

Utah Code § 76-2-402(2)(b). "Self-defense may be perfect or imperfect." *State v. Silva*, 2019 UT 36, ¶ 25, 456 P.3d 718. When a defendant raises a claim of either perfect or imperfect self-defense,

"the prosecution has the burden to prove beyond a reasonable doubt that the killing was not in self-defense." *State v. Knoll*, 712 P.2d 211, 214 (Utah 1985). If the prosecution fails to disprove beyond a reasonable doubt that the killing was in self-defense, the defendant is either entitled to an acquittal or a reduction of the murder charge to manslaughter depending on whether the criteria for perfect or imperfect self-defense are satisfied. *See id.*; *State v. Henfling*, 2020 UT App 129, ¶ 39, 474 P.3d 994.

¶30    The only difference between perfect self-defense and imperfect self-defense claims is that to succeed on an imperfect self-defense claim, a defendant need not "show that the use of deadly force was legally justifiable under the circumstances." *Silva*, 2019 UT 36, ¶ 26. In other words, "[p]erfect self-defense requires that a defendant's belief that force is necessary be both reasonable and legally justified. Imperfect self-defense, meanwhile, requires only that the defendant's belief be reasonable." *Id.* ¶ 29. Because "[i]mperfect self-defense is a strict subset of perfect self-defense," if the State has presented some evidence from which a jury could find beyond a reasonable doubt that imperfect self-defense does not apply, then the State has necessarily presented some evidence that perfect self-defense also does not apply. *Id.* ¶ 24.

¶31    Here, viewing the evidence in the light most favorable to the State, we conclude that the State presented some evidence that Palmer could not reasonably believe lethal force was necessary during his interaction with Driver. Although Palmer and Friend both testified they were in fear for their lives and Palmer acted in self-defense, the State presented evidence to undermine both Palmer's and Friend's credibility. First, though Palmer and Friend both testified that Driver asked them if they wanted to die, no other witness could corroborate this statement. Eyewitness—the only other person to observe the exchange—testified that he could not hear the words spoken between Driver, Friend, and Palmer.

¶32   Next, the jury heard evidence countering Palmer's and Friend's testimony that Driver was reaching for a weapon. First, Eyewitness testified that he did not see Driver with a gun or other weapon and did not see him lean over to grab anything in the truck. Second, Palmer testified that Driver was "hanging out" of the truck window with his head "almost out the window," which is inconsistent with a person reaching down for a weapon. Third, Eyewitness testified that Driver was trying to open the door from the outside, which is also difficult to reconcile with reaching in the truck for a weapon.

¶33   And, importantly, neither Palmer nor Friend ever told the police they feared for their lives and acted in self-defense. Indeed, instead of telling the police during their post-arrest interviews they were scared of Driver and that Palmer shot him in self-defense, both Palmer and Friend denied knowing anything about the shooting. But at trial, they both admitted they lied to the police in those interviews and Palmer acknowledged he never told the police that he was afraid of Driver, that he saw Driver reaching for a weapon, or that he believed he needed to act in self-defense. The first time he said he acted in self-defense was during his testimony at trial.

¶34   Lastly, the State presented evidence to undermine both Palmer's and Friend's credibility generally, including: (1) pointing out that Palmer's and Friend's trial testimony about where they were standing when Palmer fired the gun conflicted with the testimony of Eyewitness, the physical evidence, and the diagram Friend drew the morning before he testified; (2) impeaching Friend with discrepancies between his trial testimony and his interview with the State earlier the same morning; (3) impeaching Friend and Palmer's story about wanting to play basketball with the fact that there were no basketball courts at the park and neither of them had a basketball with them; (4) reminding the jury that both Palmer and Friend lied in their initial interviews with the police; and (5) stating that Palmer's and

Friend's actions of running and changing clothes after the shooting showed consciousness of guilt.

¶35 Ultimately, the "jury is the exclusive judge of credibility." Utah Code § 78B-1-128(4). And the jury could have chosen to discredit the self-defense testimony from Palmer and Friend due to the State's evidence. *See State v. Frame*, 723 P.2d 401, 404 (Utah 1986) (per curiam) ("The jury need not accept the version [of the facts] advanced by the defendant, but may weigh the evidence and draw its own conclusions and inferences as to his conduct and intent.").

¶36 Therefore, viewing the evidence in the light most favorable to the State, we conclude the State met its burden by presenting "some evidence from which a reasonable jury could find that [Palmer] did not act in self-defense." *State v. Doyle*, 2018 UT App 239, ¶ 28, 437 P.3d 1266 (cleaned up). Thus, the district court did not err in denying the motion for a directed verdict.

CONCLUSION

¶37 Because the State produced some evidence from which a reasonable jury could find beyond a reasonable doubt that Palmer did not act in self-defense, Palmer has not met his burden of demonstrating the district court erred in denying his motion for a directed verdict. We affirm his convictions.

———————