**2019 UT App 188**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
OYAH TONGSON RIVERA,
Appellant.

Opinion
No. 20180546-CA
Filed November 21, 2019

Third District Court, Salt Lake Department
The Honorable Todd M. Shaughnessy
No. 161908011

Teresa L. Welch, Maren E. Larson, and Heidi Buchi,
Attorneys for Appellant

Sean D. Reyes and Thomas B. Brunker, Attorneys
for Appellee

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES JILL M. POHLMAN and DIANA HAGEN concurred.

MORTENSEN, Judge:

¶1     A jury convicted Oyah Tongson Rivera on three counts of
child abuse. The abuse involved Rivera repeatedly using pliers
to pinch her three stepchildren. Physical examinations revealed
scarring and cuts all over the children's bodies. All three
children told doctors, investigators, and others that Rivera
inflicted the injuries. In later statements before and at trial, the
children recanted. The jury nevertheless found Rivera guilty. We
affirm.

BACKGROUND[1]

¶2     In June 2016, three siblings—K.S., a boy age 12; F.S., a boy age 10; and H.S., a girl age 8—told their father (Father) that Rivera, their stepmother, had been abusing them.[2] The children told Father that when Rivera got angry with them, she would call them into her room, pull a pair of pliers out of a drawer, and pinch them repeatedly all over their bodies. After seeing the marks and learning that Rivera had forced K.S. and F.S. to beat H.S. the day before, Father consulted his attorney, who took the family to a YWCA. The YWCA called the police.

*The Investigation*

¶3     Police officers performed a welfare check at the house where the children were being cared for by their seventy-year-old, ill grandfather. The officers could see that the children had marks, scars, and cuts—some readily visible and some under their clothing—all over their bodies. The officers also saw large bruises on the sides of H.S.'s face. They then contacted Father and brought him to his house. Rivera was arrested that night.

¶4     The next morning, Father brought the children to meet with Child Protective Services (CPS) for initial interviews. CPS determined that the grandfather was not healthy enough to have caused the injuries. CPS also investigated Father by interviewing him on multiple occasions and repeatedly checking in on the children outside Father's presence to verify their safety.

---

1. "On appeal, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly." *State v. Maese*, 2010 UT App 106, ¶ 2 n.2, 236 P.3d 155.

2. These were the ages of the children when they reported the abuse in 2016.

¶5  A few days later, a child abuse pediatrician (Doctor) conducted a physical examination of each child. As part of the exams, Doctor took a medical history. Each child separately told Doctor that Rivera had inflicted the marks on their bodies by using pliers to pinch them on multiple occasions. Specifically, K.S. told Doctor that the pinching occurred "once or twice a week" over the previous eight months. K.S. explained that when "something bad would go on inside [Rivera's] head," she would pinch them with the pliers. Doctor also observed scarring and cuts all over the children's bodies, including on their arms, hands, chest, stomach, back, legs, and genitalia.[3]

¶6  In summarizing her conclusions of the physical exams, Doctor stated,

> These three children gave a history of abusive behavior by their [step]mother, plier marks and scratches. They had multiple marks consistent with this. And I concluded that the marks were abusive in nature. I felt that was physical abuse and psychological abuse because this was repeated over time, both according to the history. And on physical [examination], we can say that there was more than one episode of abuse. I think that that's psychologically bad because . . . these actions are akin to torture. And they would anticipate that it might happen again. I also feel that the boys being forced to hit [their sister], according to the history, is psychologically damaging.

---

3. Photographs of the children entered into evidence verify the extent of their injuries. In reviewing these photographs, one might mistakenly conclude that the children had been peppered with a shotgun blast based on the density of the scarring to their bodies.

¶7     A few days later, the children were each interviewed individually by a detective (Detective) at the Children's Justice Center (CJC). K.S. told Detective that Rivera scratched, kicked, punched, and slapped the children, stating, "She does the same thing every time she gets angry. She slaps us, kicks us, [and] pinches us with pliers." He also described other punishments: being hit in the head with a can of food; being beaten with a wooden ladle; having a water mug broken on his head; and being forced to kneel on uncooked rice, peas, and peppercorns while holding books in his outstretched arms. Finally, K.S. described an incident where Rivera ordered him and F.S. to punch H.S. for not reading the dictionary loudly enough.

¶8     F.S. recounted many of the same details at his separate CJC interview. He said Rivera pinched him with pliers or her fingernails when he did "the same mistake all over again and again" or when he did not "take responsibility when she's not . . . around." F.S. also revealed that Rivera ordered him and K.S. to punch H.S. in the face and torso.

¶9     In her CJC interview, H.S. revealed that Rivera pinched her with pliers all over her body, including her legs, her stomach, her arms, her torso, and her shoulders. When asked why Rivera pinched her with pliers, H.S. stated, "[B]ecause I never learn and I never talk to her and I never ask her, I never told her the things that I am doing . . . . I only say I will learn, I will learn, I will ask, I will ask, I will talk to her. And then I never do it. I forget." H.S. also recounted the incident when Rivera ordered K.S. and F.S. to punch and slap her for failing to read the dictionary loudly enough.

¶10    When interviewed by CPS, Rivera admitted to "pinching [H.S.] with the pliers one time" and pinching K.S. "with her acrylic nails" as disciplinary punishment. Rivera complained that she was frustrated because Father was cheating on her, Father forced her to have sex, and she had to take care of the

children—including homeschooling them—even though she was just their stepmother.

¶11 Later, when asked by Detective about the marks and bruises on the children, Rivera stated that "she wasn't the only one that did this to the children." She told Detective that she had "used force, like hurt [the children] physically, just so they obey me." But she also expressed remorse, saying, "I know this is bad because I hurt them, but it's not like I'm doing it for fun . . . . I don't want to abuse the children." However, Rivera refused to answer Detective's questions about whether she ever used pliers to pinch the children. Regarding the dictionary incident, Rivera told an officer that K.S. is "the big brother. I don't have to hurt [H.S.]—don't have to hurt them. Let [K.S.] do it." Finally, Rivera told Detective, "The incident that happened with [H.S.] . . . I was ready to surrender . . . . This is the worst thing I've ever [done]."

¶12 About two years later in April 2018, Doctor reevaluated the children shortly before the trial. Many of the marks had cleared; and although some remained, there was no indication of new injury from abuse. However, the children offered a different explanation to Doctor for the marks on their bodies from what they had told her two years earlier. H.S. told Doctor that Rivera was going to leave, so the children inflicted the injuries on each other "to make her feel sorry for them so she wouldn't leave." K.S. told Doctor the same thing: "We made up that [Rivera] did it, but really she was going to leave and we did it to ourselves so that she would feel sad for us and she would stay."[4] F.S. told Doctor substantially the same story about the source of the injuries. When Doctor confronted him about the disparity, F.S. replied, "I never said that." In her trial testimony, Doctor

---

4. About this same time, K.S. told his ecclesiastical leader that the children had pinched each other and had made up the story about Rivera inflicting the abuse.

confirmed that it is not uncommon for children to recant allegations of abuse.

*The Trial*

¶13   At trial, the children repeated that they had caused the injuries to themselves. They explained that because Rivera and Father were constantly fighting, they feared Rivera was going to leave and reasoned that once she saw their injuries, she would feel sorry for them and stay. But much of the children's testimony at trial conflicted. For example, K.S. said they came up with the plan to blame Rivera for the injuries when the police arrived, but he was unable to explain how they communicated their plan to each other on such short notice. F.S. said that the three children sat down and talked over the plan before the police arrived. With regard to coming up with the plan to pinch themselves, K.S. testified that he and H.S. formulated the idea in their bedroom and later told F.S. about it. F.S. testified that the three hatched the plan together in the living room. H.S. said K.S. made up the plan and told her and F.S. about it.

¶14   The children's trial testimony was also significantly inconsistent with regard to how they received the injuries. Among these pervasive inconsistencies, K.S. testified that he alone pinched his own arms and stomach, but earlier he said F.S. had caused some of his pinch marks. F.S. testified that he didn't want to pinch himself because he knew it would hurt, so he asked his brother to do it for him. But he later said that he pinched himself.

¶15   Rivera faced three counts of child abuse, one count of witness tampering, and one count of assault.[5] After the State

---

5. Regarding the last two counts, the Information stated that (1) the children had observed Rivera beat Father and (2) Father

(continued…)

closed its case-in-chief, Rivera moved for a directed verdict based on insufficiency of the evidence on all counts. Citing *State v. Robbins*, 2009 UT 23, 210 P.3d 288, Rivera argued that the "prosecution can't be said to have proven their case beyond a reasonable doubt, because there [was] so much variance and differing between the testimony of all of [the witnesses] regarding what happened and who actually did what they did." The district court granted the motion with respect to the counts for witness tampering and assault but denied it for the counts of child abuse.

¶16    Rivera then testified, denying that she ever pinched the children with pliers, forced them to hit each other, or made them kneel on objects. She also said that she first saw injuries on the children via Skype when she lived in the Philippines and they lived in Bahrain with Father. She said she went to Bahrain to be with the children because they were "reaching out" to her and because she believed they were being "tortured." She testified that she agreed to marry Father because he said he could help her get a U.S. visa.

¶17    Father also testified at trial. He acknowledged that he had cheated on Rivera, but he denied ever hitting, biting, or using fingernails or pliers to pinch the children. Rivera's son testified that he had seen Father discipline the children in Bahrain by slapping their faces and lifting them by their shirts. Rivera's sister testified that she saw Father drop H.S. on a couch and "bit[e] her butt."

¶18    The jury convicted Rivera of three counts of child abuse. Rivera appeals.

---

(…continued)
revealed that Rivera beat him and threatened to have him deported if he reported her abuse of the children.

ISSUE AND STANDARD OF REVIEW

¶19　The sole issue on appeal is whether there was sufficient evidence to convict Rivera of child abuse where the three children testified at trial that Rivera had not pinched them, contradicting some of their pretrial statements, in which they stated that she had. Rivera argues that this lack of consistency between trial testimony and pretrial statements creates a situation in which the accusations against her are "too inherently improbable to support the verdict." "When a jury verdict is challenged on the ground that the evidence is insufficient, we review the evidence and all inferences which may reasonably be drawn from it in the light most favorable to the verdict." *State v. Hirschi*, 2007 UT App 255, ¶ 15, 167 P.3d 503 (cleaned up). "And we will not reverse a jury verdict if we conclude that some evidence exists from which a reasonable jury could find that the elements of the crime had been proven beyond a reasonable doubt." *State v. Maestas*, 2012 UT 46, ¶ 177, 299 P.3d 892 (cleaned up). Thus, "we may reverse a verdict only when the evidence, so viewed, is sufficiently inconclusive or inherently improbable that reasonable minds must have entertained a reasonable doubt that the defendant committed the crime of which he or she was convicted." *State v. Graves*, 2019 UT App 72, ¶ 17, 442 P.3d 1228 (cleaned up).

ANALYSIS

¶20　Rivera contends that there was insufficient evidence to support her convictions for child abuse. Specifically, she argues that (1) the children testified at trial that Rivera did not abuse them, (2) her admission that she used her nails to pinch K.S. on one occasion does not constitute child abuse but is reasonable parental discipline, and (3) trial evidence supports the conclusion that Father more likely caused the scars on the children. In support of this claim, Rivera argues that the children's pretrial allegations that she pinched them with pliers

are "too inherently improbable to support the verdict." In effect, Rivera urges us to determine that the children's pretrial statements were inherently improbable and to rely only on the trial testimony. Thus, we first address whether the children's statements were inherently improbable. Then, having determined that they were not, we consider whether there was sufficient evidence to support Rivera's convictions for child abuse.

## I. Inherent Improbability Exception

¶21    An appellate court is "not normally in the business of reassessing or reweighing evidence" and resolves "conflicts in the evidence in favor of the jury verdict." *State v. Prater*, 2017 UT 13, ¶ 32, 392 P.3d 398 (cleaned up). Indeed, "there is perhaps no more axiomatic statement when reviewing jury verdicts than this: The choice between conflicting testimony is within the province of the jury." *State v. Cady*, 2018 UT App 8, ¶ 23, 414 P.3d 974 (cleaned up). But "in some unusual circumstances we will conclude that the testimony presented to the jury was so unreliable that it cannot form the basis of a conviction." *Prater*, 2017 UT 13, ¶ 32 (cleaned up). Such a rare circumstance exists when "the evidence is so inconclusive or inherently improbable that it could not support a finding of guilt beyond a reasonable doubt." *State v. Workman*, 852 P.2d 981, 984 (Utah 1993).

¶22    In *State v. Robbins*, our supreme court articulated "the scope of the inherent improbability" exception. 2009 UT 23, ¶¶ 13, 19, 210 P.3d 288. A court can "reevaluate the jury's credibility determinations only in those instances where (1) there are material inconsistencies in the testimony and (2) there is no other circumstantial or direct evidence of the defendant's guilt. The existence of any additional evidence supporting the verdict prevents the judge from reconsidering the witness's credibility." *Id.* ¶ 19. In *Prater*, the court clarified the *Robbins* formulation of the inherent improbability exception by stating that it is "inconsistencies in the [witness's] testimony *plus* the patently

false statements the [witness makes] *plus* the lack of any corroboration that [allows a] court to conclude that insufficient evidence [supports a defendant's] conviction." 2017 UT 13, ¶ 38.

¶23    This "narrow" formulation of the exception found in *Robbins* and *Prater* presents "a significant barrier in succeeding on claims of inherent improbability." *Cady*, 2018 UT App 8, ¶¶ 17–18. Thus, "[i]t is difficult to successfully establish such a claim on appeal." *Id.* ¶ 18; *see also State v. Doyle*, 2018 UT App 239, ¶ 17, 437 P.3d 1266 (stating that "the inherent improbability [exception] has very limited applicability and comes into play only in those instances" that satisfy the approach adopted in *Robbins* and *Prater* (cleaned up)); *State v. Ray*, 2017 UT App 78, ¶ 25, 397 P.3d 817 ("'Inherent improbability' . . . does not apply more generally to cases involving a victim's incredibility—not even significant incredibility."), *cert. granted on other grounds*, 406 P.3d 250.[6]

¶24    Just as the court in *Robbins* plainly stated that *any* additional evidence supporting the verdict would preclude a judge from reconsidering a witness's credibility, *Robbins*, 2009 UT 23, ¶ 19, under *Prater*, if an appellant fails to show all three elements—material inconsistencies *plus* patent falsity *plus* lack of corroboration—a judge is likewise precluded from reconsidering witness credibility, 2017 UT 13, ¶ 42 (stating that a court may find witnesses' testimony inherently improbable only when "no other circumstantial or direct evidence support[s] the

---

6. Undue micro-focus on the elements of the inherent improbability exception often leads to legal myopia where the ultimate question—whether a reasonable jury could find a defendant guilty beyond a reasonable doubt—is lost in the details. A case which actually falls within the *Robbins–Prater* rubric is exceedingly rare. In fact, we have not found a single Utah decision examined under that rubric that has reversed a verdict since *Robbins*.

defendant's guilt" (cleaned up)); *see also State v. Crespo*, 2017 UT App 219, ¶ 27, 409 P.3d 99 (stating that under the inherent improbability exception, the credibility of a witness's testimony may be reassessed only when such testimony "is the sole evidence that a crime was even committed and there is a complete lack of circumstantial evidence" (cleaned up)). On appellate review, because all three elements of the inherent improbability exception must be met under *Prater*, where we identify that any one of them is missing, the claim of inherent improbability fails.

¶25    Rivera's claim of inherent improbability fails because the children's pretrial statements were corroborated. Rivera argues that the children's statements lack corroboration because (1) no testimony was presented at trial of anyone—other than the children—seeing Rivera inflict the injuries, (2) Rivera's pretrial admissions of using force against the children constituted reasonable parental discipline, and (3) physical evidence was lacking since the pliers were never tested for Rivera's fingerprints. But in making this claim, Rivera ignores other evidence that supports the verdict.

¶26    The children uniformly reported the abuse—and identified Rivera as having inflicted it—to Father, to Detective during the CJC interviews, and to Doctor. *See Prater*, 2017 UT 13, ¶¶ 13, 43 (noting the consistent testimony among the three witnesses). In addition, the details in the children's statements about the abuse corroborated each other. Each child told of Rivera using pliers to pinch them, and the children all recounted the incident of Rivera telling the brothers to beat their sister. And insofar as physical evidence is concerned, the photographs taken during the physical examinations reveal numerous scars consistent with having been pinched by pliers on multiple occasions. Indeed, Doctor, after examining the extensive scarring on the children's bodies, described the abuse they suffered as "akin to torture." And Rivera downplays her pretrial admissions of abusing the children. She admitted to pinching H.S. with

pliers and pinching K.S. with her nails. When confronted about the scars and marks on the children, Rivera justified herself by saying that "she wasn't the only one that did this to the children." Finally, she admitted that she told the brothers to discipline H.S. for not reading the dictionary loud enough.

¶27 In sum, the children's pretrial statements, made during the investigation, were corroborated. Therefore, they cannot be characterized as inherently improbable.

## II. Sufficiency of the Evidence

¶28 "In considering an insufficiency-of-evidence claim," an appellate court will not reverse a jury verdict provided it can "conclude that some evidence exists from which a reasonable jury could find that the elements of the crime had been proven beyond a reasonable doubt." *State v. Maestas*, 2012 UT 46, ¶ 177, 299 P.3d 892 (cleaned up). We conclude that such evidence exists to support the jury's verdict.

¶29 Resting her argument on the foundation that the children's statements made during the primary investigation were inherently improbable, Rivera asserts that she was convicted on insufficient evidence. She asserts insufficiency in three different ways. We address each in turn.

¶30 Rivera first argues that the children's trial testimony—because it was made under oath—should be afforded greater weight than their pretrial statements. And based on the children's trial testimony alone, Rivera contends that there was insufficient evidence for the jury, without relying on "speculation and conjecture," to convict her. But, as demonstrated above, Rivera's assertion that the children's pretrial statements were inherently improbable fails. The children's statements were properly accepted and weighed by the jury. And when evidence is disputed, as it was in this case, it is not for the court to resolve the conflict by excluding certain evidence from consideration. Rather, it is the jury's job to sort

through conflicting evidence and to assess the credibility of the witnesses. *See State v. Cady*, 2018 UT App 8, ¶ 23, 414 P.3d 974. Far from showing insufficiency, Rivera has simply identified a conflict in the evidence that requires resolution through deliberation of a factfinder, which is a function the jury has carried out here.

¶31 Second, Rivera claims that her pretrial admissions about disciplining the children were insufficient to support a finding that she caused "serious physical injury" to them under the Utah Code. *See* Utah Code Ann. § 76-5-109(1)(f)(ii)(E) (LexisNexis Supp. 2016) (stating that "any combination of two or more physical injuries inflicted by the same person, either at the same time or on different occasions" constitutes "serious physical injury"). But Rivera's argument is misplaced. It does not matter whether her pretrial admissions, *standing alone*, demonstrated child abuse. Rather, the factfinder considers the evidence taken as a whole. Indeed, discrete evidence in many trials would be insufficient to support a conviction if viewed in a vacuum, apart from other evidence. But we do not consider evidence in such a piecemeal and isolated fashion. Instead, we analyze whether there is sufficient evidence to support a verdict "in light of the totality of the evidence." *State v. Ashcraft*, 2015 UT 5, ¶ 27, 349 P.3d 664.

¶32 Furthermore, Rivera's pretrial statements—when considered with all the other evidence—support her conviction. She admitted to hurting the children. She admitted to using pliers to discipline H.S. She admitted to pinching the children with her nails. She admitted to having K.S. and F.S. punch H.S. All three children's statements to investigators corroborate these same events. Furthermore, as described above, the abusive nature of Rivera's admitted methods of discipline are corroborated by the physical-examination photographs and by Doctor's testimony.

¶33   Third, Rivera argues that the testimony about Father reveals that he most likely injured the children. Citing *State v. Cristobal*, 2010 UT App 228, 238 P.3d 1096, Rivera asserts that because there is evidence that Father may have abused the children, the jury's verdict convicting her was based on "speculation and conjecture" and unreasonable inferences. But Rivera's argument employs an overly broad understanding of "speculation." Rivera would have us conclude that by presenting an alternate explanation for the children's injuries, she has established that her conviction was based on speculation. This is incorrect. "A jury draws a reasonable inference if there is an evidentiary foundation to draw and support the conclusion. In the case of speculation, however, there is no underlying evidence to support the conclusion." *Salt Lake City v. Carrera*, 2015 UT 73, ¶ 12, 358 P.3d 1067. As explained above, there is certainly an evidentiary foundation from which to draw and support the conclusion that Rivera pinched the children with pliers and otherwise abused them.

¶34   Rivera's insufficiency-of-the-evidence argument is unpersuasive because the "existence of a conflict in the evidence does not render the totality of the evidence insufficient. It is the role of the factfinder to examine and resolve such conflicts." *State v. Black*, 2015 UT App 30, ¶ 19, 344 P.3d 644. And that is precisely what the jury did in this case. It considered the conflicting evidence and served "as the exclusive judge of both the credibility of witnesses and the weight to be given to particular evidence" in convicting Rivera of child abuse. *Id.* (cleaned up).


CONCLUSION

¶35   Rivera's claim that the children's pretrial statements were inherently improbable fails because the statements were corroborated. And Rivera's claim that she was convicted on insufficient evidence fails because there was ample evidence to support the verdict rendered by the jury. We therefore affirm.

————————