**2020 UT App 118**

# THE UTAH COURT OF APPEALS

STATE OF UTAH
Appellee,
*v.*
CHAD ROLAND LEVASSEUR,
Appellant.

Opinion
No. 20190299-CA
Filed August 13, 2020

Third District Court, Salt Lake Department
The Honorable Amber M. Mettler
No. 171912673

Teresa L. Welch, Wendy Brown, Maren E. Larson,
and Heidi Buchi, Attorneys for Appellant

Sean D. Reyes and Jonathan S. Bauer,
Attorneys for Appellee

JUDGE JILL M. POHLMAN authored this Opinion, in which
JUDGES KATE APPLEBY and RYAN M. HARRIS concurred.

POHLMAN, Judge:

¶1     Chad Roland LeVasseur appeals his conviction on one count of second-degree-felony insurance fraud. He argues that the evidence was insufficient to convict him. We affirm.

## BACKGROUND[1]

¶2    On the night of March 27, 2016, LeVasseur and his best friend at the time (Friend) were "driving around, just hanging out" in Provo, Utah. After they separated, Friend went home, but received a phone call from LeVasseur "around midnight-ish" as she pulled into her driveway. In that phone call, LeVasseur related that "he had been in an accident," and Friend "offered to go help him." Because she "didn't know exactly how to get" to LeVasseur's location, she called him for additional directions as she was en route.

¶3    When Friend arrived at the scene, LeVasseur's car was "parked by the curb in pieces kind of," with "impact damage to the left front." LeVasseur was the only person there. After Friend helped LeVasseur "pick[] everything up" off the side of the road, LeVasseur, acting "[a] little stressed out" and "a little worried," told her that the accident occurred as he "was making a drift video[2] and he lost control," causing him to hit a concrete barrier. LeVasseur showed Friend the video, which depicted him "going up the road, turning," when the camera "fell onto the floor." While the video did not show the crash itself, Friend was

---

1. "On appeal, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly. We present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Bond*, 2015 UT 88, ¶ 3 n.2, 361 P.3d 104 (cleaned up).

2. *See Drifting*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/drifting [https://perma.cc/5CF4-HFWD] (defining "drifting" as "the act or activity of steering an automobile so that it makes a controlled skid sideways through a turn with the front wheels pointed in a direction opposite to that of the turn").

able to "hear him crash into the barrier" before the video stopped.

¶4    Once the two began "talking about what he was going to do," LeVasseur said that he "didn't have full coverage" on his car, mentioning that "he needed to switch it before we did anything else." LeVasseur then called his car insurance company (Insurance Company) to make changes to his policy, asking that his comprehensive deductible be decreased from $2,000 to $500 and that collision coverage be added with a $500 deductible. That call took place at approximately 12:25 a.m. on March 28, with the policy changes "locked in" at nearly the same time.

¶5    After calling Insurance Company, LeVasseur "waited a little while" before calling the police to report the accident, which Friend attributed to LeVasseur's desire to "show time between everything happening." While waiting, LeVasseur told Friend he was going to tell the police that, upon coming to the corner, he swerved to miss a deer and crashed. LeVasseur wanted Friend to say that she had not seen the crash but had been following "a little behind."

¶6    LeVasseur called the police at 12:57 a.m., and an officer (Officer) responded around 1:00 a.m. LeVasseur told Officer that "a deer had run out in front of him and that he had swerved to avoid" it, causing the crash. Friend, wanting to support LeVasseur, told Officer she had not seen the crash, which was true, and she had been following behind him at the time, which was not true. Officer completed a report, which included LeVasseur's statement about the deer.

¶7    Shortly before 2:00 a.m., LeVasseur reported the accident to Insurance Company and made a claim on his policy for it. He reported that the time of loss was 1:00 a.m. The claim report also included Friend's name and phone number. Because of the timing of the policy changes and the claim, Insurance Company

flagged the claim as potentially fraudulent and referred it to one of the company's investigators (Investigator).

¶8    As part of the investigation, Investigator obtained LeVasseur's cell phone call log for March 27 and 28. The phone log showed phone calls between Friend and LeVasseur at 12:11 a.m., 12:25 a.m., and 12:30 a.m. It also showed calls placed to Insurance Company at 12:19 a.m., 1:22 a.m., and 1:41 a.m.

¶9    Investigator also interviewed Friend some nine months after the accident. Friend told Investigator that she had "lied to the police" about the night's events and that, rather than swerving to avoid a deer, LeVasseur had been making a drift video at the time of the accident. She also told Investigator that she was present for the policy-change phone call and that the accident preceded the call.

¶10    Insurance Company ultimately estimated the total damage to LeVasseur's car as $3,536.97, minus the $500 deductible, and LeVasseur additionally claimed medical damages of $4,515.08. But Insurance Company did not pay the claim.

¶11    The State charged LeVasseur with one count of committing a fraudulent insurance act, claiming that LeVasseur submitted the claim knowing it was fraudulent. *See generally* Utah Code Ann. § 76-6-521 (LexisNexis 2017).[3] The case proceeded to a jury trial.

---

3. The State charged LeVasseur under section 76-6-521(1)(b)(i) of the Utah Code, which provided at the time that "[a] person commits a fraudulent insurance act if that person with intent to defraud . . . presents . . . any oral . . . statement or representation as part of or in support of a claim for payment or other benefit pursuant to an insurance policy, certificate, or contract . . .

(continued…)

¶12   At trial, the main issue was whether LeVasseur provided a "statement or representation knowing that the statement or representation contains false or fraudulent information concerning any fact material" when filing his insurance claim— specifically, whether LeVasseur knowingly misrepresented the circumstances surrounding his accident. *See id.* § 76-6-521(1). Three witnesses testified for the State to the events described above: Investigator, Officer, and Friend.

¶13   During his testimony, Investigator described, among other things, the reasons LeVasseur's claim was flagged as potentially fraudulent, the extent of his investigatory efforts, and his interactions with both LeVasseur and Friend in relation to the claim. Investigator also testified about his observations of LeVasseur's vehicle, stating that it appeared to be specially outfitted for drifting and that his vanity license plate matched a website address for a site dedicated to drifting.

¶14   In conjunction with Investigator's testimony, the audio recordings of the policy-change phone call and the claim-report phone call were played for the jury. In particular, during the first few seconds of the policy-change phone call, LeVasseur can be heard describing what seems to have been the accident to someone, stating that he "hopped it" and "whacked into"

---

(…continued)

knowing that the statement or representation contains false or fraudulent information concerning any fact or thing material to the claim." Utah Code Ann. § 76-6-521(1)(b)(i)(A), (1)(b)(ii) (LexisNexis 2017). And because the value LeVasseur attempted to claim on his policy exceeded $5,000, it was charged as a second-degree felony. *See id.* §§ 76-6-521(2)(b), 76-10-1801(1)(d) (providing that a violation is a second-degree felony if the value of the "property, money, or thing obtained or sought to be obtained is or exceeds $5,000").

something. The State also introduced the phone call log, which showed the timing of calls LeVasseur placed to Friend and Insurance Company.

¶15 After the State rested, LeVasseur moved for a directed verdict on two grounds. First, he argued that Friend's testimony was inherently improbable based on perceived discrepancies in the evidence between the phone call timeline and Friend's testimony about which calls she was present for. Second, he argued that, without Friend's testimony, the evidence was insufficient to show that he "fabricated" information.

¶16 The district court denied the motion. The court first explained that it did not find Friend's testimony to be inherently improbable, and that, in its view, the potential discrepancies in Friend's testimony presented "a credibility question . . . that's best left to the jury." In this respect, the court noted that the jurors would be instructed that they "can disbelieve all or disbelieve part of" Friend's testimony. The court then concluded that the State had met its burden of proof and that "a reasonable jury could . . . convict [LeVasseur] based on the evidence presented."

¶17 The jury convicted LeVasseur as charged. LeVasseur timely appeals.

ISSUE AND STANDARD OF REVIEW

¶18 LeVasseur argues that the district court erred by denying his motion for directed verdict, claiming that the evidence supporting his conviction was insufficient. We review a district court's ultimate ruling on a motion for directed verdict for correctness. *State v. Gonzalez*, 2015 UT 10, ¶ 21, 345 P.3d 1168. But we will not "reverse a jury verdict if we conclude that some evidence exists from which a reasonable jury could find that the elements of the crime had been proven beyond a reasonable

doubt." *State v. Rivera*, 2019 UT App 188, ¶ 19, 455 P.3d 112 (cleaned up).

## ANALYSIS

¶19 LeVasseur challenges the sufficiency of the evidence supporting his conviction on two grounds. First, he claims that Friend's testimony was "too inherently improbable" to be considered by the jury. Second, he asserts that the verdict was "based on speculation" and unreasonable inferences and the evidence therefore was not sufficient to support the verdict.

### I. Inherent Improbability

¶20 LeVasseur argues that Friend's testimony was inherently improbable and therefore could not support his conviction. Citing inconsistencies and contradictions in Friend's testimony, he contends that Friend's statements and testimony regarding "the events and timing of the car crash were materially inconsistent, patently false, and lacked corroboration."

¶21 A court must "ordinarily accept the jury's determination of witness credibility." *State v. Robbins*, 2009 UT 23, ¶ 16, 210 P.3d 288; *see also State v. Cady*, 2018 UT App 8, ¶ 23, 414 P.3d 974 ("There is perhaps no more axiomatic statement when reviewing jury verdicts than this: The choice between conflicting testimony is within the province of the jury." (cleaned up)). But "a conviction not based on substantial reliable evidence cannot stand," *Robbins*, 2009 UT 23, ¶ 14 (cleaned up), and "when the witness's testimony is inherently improbable, the court may choose to disregard it," *id.* ¶ 16; *see also id.* ¶ 18 (stating that "the court may choose to exercise its discretion to disregard inconsistent witness testimony only when the court is convinced that the credibility of the witness is so weak that no reasonable jury could find the defendant guilty beyond a reasonable doubt").

¶22 "[W]itness testimony is inherently improbable and may likewise be disregarded if it is (1) physically impossible or (2) apparently false." *Id.* ¶ 16. "Testimony is physically impossible when what the witness claims happened could not have possibly occurred." *Id.* ¶ 17. Testimony is apparently false "if its falsity is apparent, without any resort to inferences or deductions," or it is "incredibly dubious." *Id.* ¶¶ 17–18 (cleaned up).

¶23 LeVasseur challenges Friend's testimony as apparently false. Availability of relief under this theory is narrow. *State v. Skinner*, 2020 UT App 3, ¶ 31, 457 P.3d 421 (explaining the "narrowness" of the inherent improbability doctrine); *State v. Rivera*, 2019 UT App 188, ¶ 23 n.6, 455 P.3d 112 ("A case which actually falls within the *Robbins–Prater* rubric is exceedingly rare."). Our supreme court has explained that when the apparent falsity prong is invoked, a district court may "reevaluate the jury's credibility determinations only in those instances where (1) there are material inconsistencies in the testimony and (2) there is no other circumstantial or direct evidence of the defendant's guilt." *Robbins*, 2009 UT 23, ¶ 19. Indeed, in *Robbins*, "[i]t was the inconsistencies in the child's testimony *plus* the patently false statements the child made *plus* the lack of any corroboration that allowed [the supreme court] to conclude that insufficient evidence supported Robbins's conviction." *State v. Prater*, 2017 UT 13, ¶ 38, 392 P.3d 398. Thus, LeVasseur's claim will "necessarily fail where any evidence corroborates [Friend's] testimony." *See Skinner*, 2020 UT App 3, ¶ 31.

¶24 Here, the district court denied LeVasseur's directed verdict motion because it determined that Friend's testimony was not inherently improbable and that the inconsistencies and contradictions identified by LeVasseur presented a "credibility question . . . that's best left to the jury." We conclude the district court did not abuse its discretion in declining to find Friend's

testimony inherently improbable and to disregard it on that basis. *See Robbins*, 2009 UT 23, ¶ 18.

¶25 To begin with, LeVasseur is correct that, in providing two different versions of the accident's events, Friend's testimony contained inconsistencies. But we disagree that, without more, the inconsistencies were of a kind that would have allowed the district court to disregard Friend's testimony. *See id.* ¶¶ 18–19. Indeed, the inconsistency argument made by LeVasseur is similar to the inconsistency argument our supreme court rejected in *Prater*.

¶26 There, the appellant argued that three witnesses' testimonies were inherently improbable because their testimonies "changed substantially" after accepting deals with the State. *Prater*, 2017 UT 13, ¶ 30. For example, the "jury learned that [the three witnesses] all made statements to police shortly after the shooting that contradicted their trial testimony." *Id.* ¶ 39. But in rejecting the appellant's inherent improbability argument, the supreme court found it significant that "each witness admitted at trial that he or she initially lied to police" and that one of the witnesses in particular testified "that she withheld information at the preliminary hearing only because she was afraid" of retaliation. *Id.* The court explained that the fact that the three witnesses "den[ied] their involvement [in the crime] when initially interviewed by the police does not run so counter to human experience that it renders their testimony inherently improbable." *Id.* Rather, the court determined, "[t]he question of which version of their stories was more credible is the type of question we routinely require juries to answer." *Id.*

¶27 Here, as LeVasseur asserts, Friend originally reported to Officer that she was following LeVasseur at the time of the accident, then came upon him afterward. But at trial, Friend testified that she had *not* been following LeVasseur at the time of

the accident and instead was pulling into her driveway when he called her about the crash. But like the witnesses in *Prater*, Friend testified that she lied to Officer when she told him that she had been following LeVasseur immediately before the crash. She also provided an explanation for her lie, testifying that at the time, LeVasseur was her "best friend," that the lie was "what [her] best friend . . . wanted [her] to do," and that she therefore "went ahead" with the lie because she "wanted to defend [her] best friend." And she explained that she later told the truth to Investigator because she "didn't want to keep covering it with a lie" and that she "just wanted the truth to be out there because [she] didn't want to make it worse."

¶28    In our view, it "does not run so counter to human experience" that a person initially would lie to police about events surrounding a car accident at her best friend's request, motivated by a desire to protect him. *See id.* As in *Prater*, we think that, given the entirety of Friend's testimony about the varying accounts, the inconsistencies identified are not of a kind to render Friend's testimony inherently improbable. Rather, we agree with the district court that the "question of which version of [Friend's] stories was more credible is the type of question" best left to the jury to answer. *See id.*

¶29    Moreover, LeVasseur's inherent improbability challenge fails for the additional reason that there was other evidence corroborating Friend's testimony that LeVasseur knowingly submitted a fraudulent insurance claim. *See Robbins*, 2009 UT 23, ¶ 19 ("The existence of any additional evidence supporting the verdict prevents the judge from reconsidering the witness's credibility."); *Skinner*, 2020 UT App 3, ¶¶ 31, 34 (stating that "under *Robbins* and *Prater*, an inherent improbability claim will necessarily fail where any evidence corroborates the witness's testimony," and explaining that "[c]orroborating evidence sufficient to defeat a *Robbins* claim does not have to corroborate the witness's account across the board, in every particular," but

instead "just has to provide a second source of evidence for at least some of the details of the witness's story").

¶30    For example, the jury had before it the phone log of calls LeVasseur placed the night of the accident, as well as Investigator's testimony about the logs, which corroborated Friend's testimony that LeVasseur informed her of the accident before calling Insurance Company to increase his insurance coverage. The recordings of his various phone calls with Insurance Company were also admitted; in particular, during the first seconds of the original phone call to increase coverage, LeVasseur can be heard making statements that could be understood as a description of the accident, stating that he "hopped it" and "whacked into" something.

¶31    Testimony    about    LeVasseur's    vehicle,    while circumstantial, also supported Friend's testimony that LeVasseur crashed while making a drift video (as opposed to avoiding a deer); Investigator testified that LeVasseur's vehicle was specially outfitted for drifting and that his vanity license plate matched a website address for a site dedicated to drifting. And the circumstantial evidence surrounding the timing of the phone calls to increase coverage, to report the accident to the police, and to make a claim with Insurance Company—all occurring in the middle of the night within a two-hour period—also fairly supported the aspects of Friend's testimony that suggested the accident preceded LeVasseur's call to increase his insurance coverage.[4]

---

4. LeVasseur also argues that Friend's testimony is inherently improbable because it is patently false, contending that her testimony about the timeline of events was contradicted by the cell phone data and her testimony about that data. However, because we have concluded that aspects of Friend's testimony

(continued…)

¶32 For these reasons, the inconsistencies in Friend's testimony did not render it "so weak" as to afford the district court the discretion to reject Friend's testimony as inherently improbable. *See Robbins*, 2009 UT 23, ¶¶ 18–19. LeVasseur's inherent improbability challenge therefore fails.

## II. Sufficiency of the Evidence

¶33 LeVasseur additionally challenges the overall sufficiency of the evidence supporting the jury's verdict. Specifically, he claims that the State's evidence "did not prove that [he] knowingly provided false or fraudulent information to Insurance [Company] regarding the timing and specifics of the crash."

¶34 "On a sufficiency of the evidence claim we give substantial deference to the jury," and the operative question is "simply whether the jury's verdict is reasonable in light of all of the evidence taken cumulatively, under a standard of review that yields deference to all reasonable inferences supporting the jury's verdict." *State v. Ashcraft*, 2015 UT 5, ¶¶ 18, 24, 349 P.3d 664; *see also Mackin v. State*, 2016 UT 47, ¶ 29, 387 P.3d 986 (stating that "the question" on a sufficiency challenge "is whether the evidence was so lacking that no reasonable jury could find the defendant guilty beyond a reasonable doubt" (cleaned up)); *Salt Lake City v. Carrera*, 2015 UT 73, ¶ 11, 358 P.3d 1067 (recognizing that a guilty verdict may be based on direct or circumstantial evidence). "A jury's inference is reasonable unless it falls to a level of inconsistency or incredibility that no reasonable jury could accept." *Ashcraft*, 2015 UT 5, ¶ 18 (cleaned

---

(…continued)
were corroborated by other evidence, we do not address this point further. *See State v. Skinner*, 2020 UT App 3, ¶¶ 31, 34, 457 P.3d 421.

up). We thus will affirm the district court's denial of LeVasseur's directed verdict motion and the jury's verdict so long as "some evidence exists" from which a jury could find beyond a reasonable doubt that LeVasseur committed an act of second-degree-felony insurance fraud. *See State v. Gonzalez*, 2015 UT 10, ¶ 27, 345 P.3d 1168 (cleaned up).

¶35 As noted above, to obtain a conviction for second-degree-felony insurance fraud, the State was required to prove beyond a reasonable doubt that in making his insurance claim, LeVasseur, with intent to defraud, presented a "statement or representation" knowing that it contained "false or fraudulent information concerning any fact or thing material" to his insurance claim. *See* Utah Code Ann. § 76-6-521(1)(b)(i)(A), (1)(b)(ii) (LexisNexis 2017); *see also id.* §§ 76-6-521(2)(b), 76-10-1801(1)(d) (providing that a violation is a second-degree felony if the value of the "property, money, or thing obtained or sought to be obtained is or exceeds $5,000"). "A person engages in conduct . . . knowingly, or with knowledge, with respect to his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or the existing circumstances." *Id.* § 76-2-103(2).

¶36 Here, we readily conclude that there was sufficient evidence from which the jury could have determined that LeVasseur knowingly committed insurance fraud through his assertions about the circumstances of the accident. As discussed above, Friend testified that despite what she initially told Officer, LeVasseur called her around midnight to tell her he had been in an accident, that LeVasseur told her the accident occurred during his attempt to make a drifting video, and that he increased his coverage after the accident had already occurred. Nevertheless, Investigator testified (and the recording of the claim corroborated) that in making his insurance claim, LeVasseur informed Insurance Company that the accident occurred about a half an hour *after* he called to increase his

coverage. Additionally, other circumstantial evidence supported the version of events Friend testified to and, specifically, that LeVasseur knew at the time he made his insurance claim that the accident had occurred before he increased his coverage, including: LeVasseur's phone log, the recordings of the relevant phone calls (particularly the policy-change phone call, in which LeVasseur can initially be heard describing what could have been the accident), the evidence surrounding LeVasseur's drifting activities, and the overall timing of the night's events.

¶37 Taken together, Friend's testimony along with the other circumstantial evidence constituted sufficient evidence from which the jury could have found beyond a reasonable doubt that LeVasseur was aware that the assertions he made in his insurance claim surrounding the timing and details of the accident were false. *See Gonzalez*, 2015 UT 10, ¶ 27; *Ashcraft*, 2015 UT 5, ¶¶ 18, 24; *see also* Utah Code Ann. §§ 76-2-103(2), 76-6-521(1)(b). *See generally State v. Whitaker*, 2016 UT App 104, ¶ 10, 374 P.3d 56 (recognizing that, because "proof of a defendant's intent is rarely susceptible of direct proof, . . . the prosecution usually must rely on a combination of direct and circumstantial evidence to establish" it (cleaned up)). Accordingly, we conclude that the district court did not err when it denied LeVasseur's motion for directed verdict.

## CONCLUSION

¶38 We affirm LeVasseur's conviction. The district court did not err by rejecting LeVasseur's inherent improbability challenge to Friend's testimony. And in light of the evidence supporting LeVasseur's guilt, we conclude that the district court did not err by denying LeVasseur's directed verdict motion.

———————