2020 UT App 138

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
ROBERT LEE THORNOCK,
Appellant.

Opinion
No. 20180869-CA
Filed October 8, 2020

First District Court, Logan Department
The Honorable Thomas Willmore
No. 171100608

David M. Perry, Attorney for Appellant

Sean D. Reyes and David A. Simpson, Attorneys
for Appellee

JUDGE MICHELE M. CHRISTIANSEN FORSTER authored this Opinion,
in which JUDGES GREGORY K. ORME and JILL M. POHLMAN
concurred.

CHRISTIANSEN FORSTER, Judge:

¶1 Robert Lee Thornock appeals from his conviction of aggravated robbery, a first degree felony. We affirm.

## BACKGROUND

¶2 Early in the morning of January 26, 2014, Thornock and his then-girlfriend (Wife) drove to a Walmart in Logan, Utah. As they were approaching the Walmart, Thornock instructed Wife to drive slowly so that he could look at a Super 8 motel they were passing.

¶3    While they were inside the Walmart, Wife saw Thornock stuff a hunting mask into his pants. They also went to the craft area, where Thornock picked up a roll of duct tape with colorful skulls on it and stated, "This will be cute." The couple did not purchase the mask or duct tape but purchased several other items and left the store.

¶4    As they passed the Super 8 motel, Thornock again told Wife to slow down and "star[ed] over at Super 8 quite hard." They eventually went to Thornock's mother's apartment, and Wife went inside at about 2:00 a.m., leaving Thornock outside with his brother (Brother).

¶5    At around 3:00 a.m., two masked men entered the Super 8 motel. One of the men carried what appeared to be a semiautomatic handgun, and the other had duct tape with colorful skulls and "tools for the robbery." They handcuffed the night manager and bound his hands with the duct tape. They stole keys, some documents, and about $150–$200 in cash.

¶6    Thornock and Brother entered their mother's apartment around 4:00 or 4:30 a.m. Thornock was acting paranoid and asked Wife, "Who are you talking to? Are you talking to the cops? Did you call the cops on me?" He then went into the living room to talk to Brother and went to bed around 5:00 or 5:30 a.m.

¶7    The next day, Thornock suggested that he and Wife go for a drive in a nearby canyon. They stopped at a campsite and built a fire. Wife observed Thornock throw a reusable blue Walmart bag with keys and papers into the fire. He also burned his hoodie.

¶8    Next, Thornock proposed that he and Wife "get married tomorrow." Wife thought it felt sudden, but she agreed. They were married a couple of days later.

¶9    In the meantime, officers had been investigating the Super 8 robbery. The detective in charge (Detective) noticed the

unusual duct tape used in the robbery and began looking into where it was sold. He found the tape for sale at the nearby Walmart in addition to camouflage hunting masks, one of which the Super 8 night manager identified as matching one of the masks worn during the robbery. Detective reviewed Walmart's surveillance video from the night of the robbery and observed a man and a woman walking through the hunting and craft sections of the store. The couple then made a purchase—that did not include either a hunting mask or duct tape—and left the store. Although the video did not show the couple stealing anything, a search of the store's electronic inventory revealed that one roll of duct tape and two masks were missing.

¶10    Detective identified the car the couple was driving from surveillance video and found that it was registered to Thornock's mother. Detective and another officer went to the mother's apartment and photographed the car in the parking lot. While they were there, they saw Thornock and Wife, who looked like the couple from the Walmart videos, approaching the car.

¶11    When the officers approached the couple, Thornock became "aggressive and angry." Officers asked if he had any weapons, and in response, Thornock pulled a knife out of his pocket and "threw it aggressively at the ground." The officers handcuffed Thornock and put him in their patrol car. When they later removed Thornock from the patrol car, they found a bag of methamphetamine in the area where he had been sitting. This led them to conduct a dog sniff around his mother's car. The dog sniff indicated positive for a controlled substance, which allowed Detective to obtain a warrant to search the car. In the course of this search, the officers discovered a camouflage face mask, white gloves, superglue,[1] and mail addressed to Thornock, Brother, and Wife.

---

1. White gloves and superglue were two of the items purchased by the couple at the Walmart.

¶12 Detective questioned both Thornock and Wife. Thornock denied committing the robbery and claimed not to remember being at Walmart. Wife eventually admitted that they had been at Walmart that night and had taken the decorated duct tape. She also directed officers to the fire pit in the canyon, where they recovered fragments of a hoodie, keys that matched those taken from the Super 8, magnetic nametags that matched those used by Super 8, and several scraps of mail addressed to the motel's owner.

¶13 Thornock was charged with felony possession of methamphetamine. However, because Wife was unwilling to testify against Thornock at that time, authorities did not have enough evidence to bring a robbery charge against him.

¶14 In connection with his methamphetamine charge, Thornock filed a motion to suppress evidence obtained as a result of his detention, claiming that he was detained in violation of his Fourth Amendment rights. The trial court denied the motion, and Thornock eventually pleaded guilty to the methamphetamine charge.

¶15 Several years later, Wife ran into Detective at a local restaurant. She told him the case had been "weighing [her] down for a while" and that she wanted to "get this off [her] conscience," so she agreed to cooperate with the prosecution of her soon-to-be ex-husband. During a new interview with police, she admitted to having lied to Detective several times during her previous interviews. With Wife's cooperation and further information about the robbery, the State charged Thornock with one count of aggravated robbery. Thornock once again moved to suppress evidence stemming from his detention. The trial court denied the motion on grounds of collateral estoppel because his motion to suppress evidence stemming from the same detention had been denied in the methamphetamine case.

¶16 Before trial began, Thornock moved to exclude a portion of his police interview. In that interview, Detective asked him

whether he had stolen anything from Walmart on the night in question. Thornock responded, "I don't steal, I kill." Detective clarified, "You don't steal, you kill? Huh. That's a pretty tough statement. Tell me what you mean by that." Thornock then proceeded to explain, "I crush my kids, pretty much kill them, suck the life out of them. Myself, anybody around me, anyone I care about. That's all I've done for years and years. I'm tired of this stuff." He then went on to explain that Wife made him feel better about himself.

¶17 Thornock argued that it would be highly prejudicial for the jury to hear him make the statement, "I kill." The State countered that the statement was relevant because (1) Thornock denied stealing things from Walmart; (2) the statements about Wife, which needed to be understood in context, were inconsistent with his proposed alibi defense that he was with his ex-wife at the time of the robbery; and (3) his admission that he damages people around him could be construed as an acknowledgement that he had hurt his family by committing the robbery. The court denied Thornock's motion to exclude the statement. The court agreed that the statement was relevant and determined that it would not be unfairly prejudicial given Thornock's clarification of what he meant by the statement.

¶18 At trial, the State relied, in part, on a theory of accomplice liability. During closing arguments, the prosecutor told the jury,

> [Thornock] clearly was one of the robbers. He was wearing a camo mask. . . . But if there's any confusion, if you find that in any way he did any of these things—he's smirking with the duct tape, scoping out the motel, providing that to someone else—still guilty if he has the intent. But he was there. He committed the robbery.

After the prosecutor finished his closing statement, defense counsel raised a concern outside the presence of the jury about the statement. He told the court that he was concerned that the

prosecutor stated "that if Mr. Thornock had bought the duct tape or looked at the duct tape, he's implicated in the robbery and can be convicted." The court agreed to give a curative instruction and crafted the language of the instruction in consultation with defense counsel and the prosecutor. Ultimately, the jury was instructed "that simply buying duct tape that matches what was used in the robbery is not sufficient to find [Thornock] guilty of armed robbery." The court further directed the jury to review the "very specific elements that must be proved beyond a reasonable doubt to find Mr. Thornock guilty beyond a reasonable doubt."

¶19 The jury convicted Thornock as charged, and he now appeals.

ISSUES AND STANDARDS OF REVIEW

¶20 Thornock first asserts that the trial court's curative instruction was insufficient to cure unfair prejudice produced by the prosecutor's allegedly improper statement. When an error is "cured by either a curative or preliminary instruction," the defendant cannot obtain reversal unless "there was an overwhelming probability that the jury was unable to follow the court's instructions, and a strong likelihood that the effect of the [error] was devastating to him." *State v. Mead*, 2001 UT 58, ¶ 50, 27 P.3d 1115 (quotation simplified). Nevertheless, we do not review claims of error when the error is invited. *See State v. Moa*, 2012 UT 28, ¶ 27, 282 P.3d 985.

¶21 Thornock next asserts that the trial court erred in denying his motion to exclude the statement, "I don't steal, I kill," under rule 403 of the Utah Rules of Evidence. "Trial courts have wide discretion in determining relevance, probative value, and prejudice," so "we will not reverse the trial court's 403 ruling unless we find it was beyond the limits of reasonableness." *State v. Beverly*, 2018 UT 60, ¶ 56, 435 P.3d 160 (quotation simplified).

¶22 Thornock further argues that the court should have disregarded testimony from Wife on the ground that it was inherently improbable and that without that testimony, the evidence was insufficient to support his conviction. We "review deferentially a trial court's decision to decline to disregard a witness's testimony due to inherent improbability, reversing the trial court's decision only if it was clearly erroneous." *State v. Skinner*, 2020 UT App 3, ¶ 20, 457 P.3d 421 (quotation simplified). However, we will not review the question of a witness's credibility if the inherent improbability argument was not specifically raised before the trial court. *State v. Doyle*, 2018 UT App 239, ¶ 19, 437 P.3d 1266.

¶23 Finally, Thornock challenges the trial court's determination that his Fourth Amendment arguments regarding his arrest were barred by the doctrine of collateral estoppel. He asks us to review this challenge for plain error. To prevail based on plain error, an appellant must show that "(i) an error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful, i.e., absent the error, there is a reasonable likelihood of a more favorable outcome for the appellant." *State v. Holgate,* 2000 UT 74, ¶ 13, 10 P.3d 346 (quotation simplified).

ANALYSIS

I. Prosecutorial Misconduct

¶24 Thornock first claims that the trial court's curative instruction was insufficient to cure the allegedly improper statement by the prosecutor. However, we do not consider the merits of this claim because Thornock invited any error.

¶25 The invited error doctrine precludes our review "when counsel, either by statement or act, affirmatively represented to the trial court that he or she had no objection to the proceedings." *Pratt v. Nelson*, 2007 UT 41, ¶ 16, 164 P.3d 366 (quotation simplified). "Our invited error doctrine arises from

the principle that a party cannot take advantage of an error committed at trial when that party led the trial court into committing the error." *Id.* ¶ 17 (quotation simplified).

¶26    Here, Thornock's counsel not only approved the curative instruction, he actively participated in crafting it. Once the trial court announced that it intended to offer a curative instruction in response to Thornock's objection, the following exchange took place:

> [Court]: So what kind of curative instruction do you want?
>
> [Defense Counsel]: I would just like the Court to say that . . . to find Mr. Thornock guilty of aggravated armed robbery, there needs to be more, he needs to have involvement in the robbery, something of that nature.
>
> . . . .
>
> [Prosecutor]: . . . . [Y]ou tell me how you want to cure it. I obviously don't want to have there be a problem.
>
> [Court]: What do you suggest?
>
> [Defense Counsel]: There's something in the nature that there needs to be more than looking at the duct tape and a smirk. . . .
>
> . . . .
>
> [Court]: Okay, anything else?
>
> [Defense Counsel]: I think that's it, your Honor.

The court, prosecutor, and defense counsel then proceeded to discuss the precise wording of the instruction together. Based on

that discussion, the court proposed, "Simply buying duct tape that matches the robbery is not sufficient to find [Thornock] guilty of armed robbery." The court then asked defense counsel, "Is that okay?" to which defense counsel replied, "Yep. That's fine, your Honor."

¶27    This situation presents a prime example of invited error. Counsel helped devise the instruction and then affirmatively represented to the court that it was adequate to resolve his concern about the prosecutor's statement. Thornock cannot now claim that the curative instruction given by the court was insufficient.

## II. Pretrial Motion

¶28    Thornock next asserts that the trial court erred in denying his pretrial motion to exclude his statement to police, "I don't steal, I kill." Thornock argues that this statement was irrelevant and unfairly prejudicial because it was likely to inflame the jury. *See* Utah R. Evid. 402 ("Irrelevant evidence is not admissible."); *id*. R. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice . . . .").

¶29    First, he argues that the statement should have been excluded as irrelevant. However, on appeal, he contests only one of the relevant purposes identified by the State: he asserts that the statement was not relevant to rebut his alibi because he did not end up relying on the alibi defense involving his ex-wife and did not call her as a witness. He does not address the other two relevant purposes asserted by the State, and most notably, he does not address the trial court's determination that the statement was relevant because Thornock "denie[d] that he stole . . . anything" and that it would be "relevant for that reason and that reason alone" even if Thornock elected not to call his ex-wife as a witness. Thus, he has failed to carry his burden of persuasion with respect to his relevance argument. *See Chard v. Chard*, 2019 UT App 209, ¶ 35, 456 P.3d 776 ("We will not reverse

a ruling of the district court that rests on independent alternative grounds where the appellant challenges fewer than all of those grounds." (quotation simplified)).

¶30    Thornock further asserts that it was an abuse of the trial court's discretion to admit the testimony because it was unfairly prejudicial. But taken in context, there is nothing about the statement that would lead the jury to take the statement at face value. As the trial court noted, if the statement was, "'I just kill,' then that would be prejudicial to the point where it needs to be excluded." But since Thornock "goes on to explain . . . what he meant," i.e., that he causes damage to his family by his actions, "that takes care of any prejudicial effect."

¶31    For these reasons, the trial court did not exceed its discretion in denying Thornock's motion to exclude the statement.

### III. Inherent Improbability

¶32    Thornock next asserts that the court erred in denying his motion for directed verdict. This argument turns on his assertion that Wife's testimony was inherently improbable under *State v. Robbins*, 2009 UT 23, 210 P.3d 288.[2] Specifically, he argues that

---

2. The State argues that Thornock did not adequately preserve this issue for appeal in his directed verdict motion. *See State v. Skinner*, 2020 UT App 3, ¶ 29, 457 P.3d 421 ("A defendant who wants a trial court to disregard a witness's testimony under *Robbins* before, or in connection with, undertaking a sufficiency-of-the-evidence review must make that request known to the trial court so that the court has an opportunity to rule on the issue."). We acknowledge that Thornock's motion was far from clear on this point, as his objections were grounded in a general assertion that Wife lacked credibility and had a motivation to lie—concerns that hardly demonstrate inherent improbability, as we explain in our analysis. *See infra* ¶¶ 33–34. Nevertheless, he

(continued…)

Wife's admission that she lied to police during her interviews; the many inconsistencies between Wife's first interview, her second interview, and her trial testimony; and Wife's animosity toward Thornock by the time of trial demonstrate that her testimony was so lacking in credibility as to be inherently improbable.

¶33   Although Wife changed her story several times, "inconsistencies . . . by themselves are insufficient to invoke the inherent improbability exception." *State v. Prater*, 2017 UT 13, ¶ 39, 392 P.3d 398 (quotation simplified). Moreover, a motive to lie "goes to the weight and credibility of the testimony"; it does not demonstrate that the testimony was inherently unreliable. *Id* ¶ 41.

¶34   Thornock asserts that Wife wanted "to help the State prosecute her husband" because they were going through a divorce and that her testimony at trial could therefore not be believed. But Wife also had a motive to lie to police during her earlier interviews—at that time, she wanted to protect Thornock from prosecution. There is nothing to definitively suggest that Wife's trial testimony was less credible than her earlier police interviews. It was a matter for the jury to decide whether Wife's trial testimony or her earlier interviews were more credible. A conclusion that Wife lied in her interviews to protect her husband but later had a change of heart and decided to tell the truth "does not run so counter to human experience that it

---

(…continued)

did argue "that the evidence that [Wife] presented or offered should not be considered by the Court" due to its lack of credibility and that "without [Wife], there is no evidence that Mr. Thornock is involved in . . . any armed robbery." By asking the court to disregard Wife's testimony on credibility grounds, Thornock managed to preserve his inherent improbability argument, though his argument was certainly not as explicit as it could have been.

renders [her] testimony inherently improbable." *See id.* ¶ 39; *see also State v. LeVasseur*, 2020 UT App 118, ¶¶ 27–28 (explaining that a jury could reasonably believe that the defendant's friend initially lied to police to protect him but later changed her story because she felt like the truth needed to come out).

¶35    Furthermore, Wife's testimony was corroborated by physical evidence. A couple who looked like Wife and Thornock were captured on the Walmart surveillance video; the unusual duct tape used in the crime, which Wife observed Thornock take, was found on the aisle of the Walmart where the surveillance camera recorded the couple shopping; and police found physical evidence relating to the crime at the fire pit to which Wife directed them. "[U]nder *Robbins* and *Prater*, an inherent improbability claim will necessarily fail where any evidence corroborates the witness's testimony" by providing "a second source of evidence for at least some of the details of the witness's story." *State v. Skinner*, 2020 UT App 3, ¶¶ 31, 34, 457 P.3d 421; *see also LeVasseur*, 2020 UT App 118, ¶¶ 29–31. Because there is significant evidence corroborating Wife's testimony, Thornock cannot succeed on his improbability claim. And because Wife's testimony supported the verdict, the district court did not err in denying Thornock's motion for directed verdict.

## IV. Collateral Estoppel

¶36    Finally, Thornock argues that the trial court should have considered his Fourth Amendment argument and should not have rejected it on grounds of collateral estoppel. Thornock asks us to review this issue for plain error, but he makes no attempt to analyze the court's collateral-estoppel decision within the plain error framework. To the extent that he does address plain error, his entire argument is devoted to rearguing the merits of the underlying Fourth Amendment issue, which is irrelevant to our examination of the collateral estoppel issue. Thornock's collateral estoppel arguments are therefore inadequately briefed, and we decline to consider them. *See State v. Thomas*, 961 P.2d 299, 304 (Utah 1998) ("It is well established that a reviewing

court will not address arguments that are not adequately briefed.").

CONCLUSION

¶37 Thornock invited any error in the court's curative instruction and therefore cannot contest the adequacy of that instruction on appeal. Further, the trial court did not exceed its discretion in admitting the "I kill" statement from Thornock's interview with Detective. Thornock cannot establish that the court erred in denying his motion for directed verdict, because Wife's testimony was not inherently improbable. Finally, we decline to address the court's collateral estoppel ruling because Thornock inadequately briefed the issue. Accordingly, we affirm Thornock's conviction.

———————